JAMES G. WILSON, APPELLANT, *v.* ANDREW P. SIMPSON, E. E. SIMPSON, JOSEPH FORSYTH, AND BAGDAD MILLS.

The documents showing the title to Woodworth's planing-machine are set forth *in extenso* in 4 Howard, 647, *et seq.*

The assignment from Woodworth and Strong to Toogood, Halstead, and Tyack (4 Howard, 655) declared not to have been fraudulently obtained according to the evidence in this case.

An assignee of Woodworth's planing-machine, having a right, under the decision in 4 Howard, to continue the use of the patented machine, has a right to replace new cutters or knives for those which are worn out.

The difference explained between repairing and reconstructing a machine.

THIS was an appeal from the Circuit Court of the United States for Louisiana.

It was a continuation of the case of Simpson et al. *v.* Wilson, reported in 4 Howard, 710, where a statement of the case is given, which need not be here repeated. All the documents relating to the patent and transfer of Woodworth's planing-machine are set forth *in extenso* in the case of Wilson *v.* Rousseau et al., 4 Howard, 647, *et seq.*

The report of the case in 4 Howard shows that the two following questions were certified to this court, viz. : —

" 1. Whether, by law, the extension and renewal of the said patent granted to William Woodworth, and obtained by William W. Woodworth, his executor, inured to the benefit of the said defendant, to the extent that said defendant was interested in said patent before such renewal and extension.

" 2. Whether, by law, the assignment of an exclusive right to the defendant, by the original patentee or those claiming under him, to use said machine, and to vend the same to others for use, within the county of Escambia, in the Territory of. West Florida, did authorize said defendant to vend elsewhere than in said county of Escambia, to wit, in the city of New Orleans, State of Louisiana, plank, boards, and other materials, prod-

ucts of a machine established and used within the said County of Escambia, in the Territory of West Florida."

On the 18th of April, 1846, the decisions of the Supreme Court in these questions were certified to the Circuit Court, as follows : —

" 1. That, by law, the extension and renewal of the said patent granted to William Woodworth, and obtained by William W. Woodworth, his executor, did not inure to the benefit of said defendant to the extent that said defendant was interested in said patent before such renewal and extension. But the law secured to persons in the use of machines at the time the extension takes effect the right to continue the use of the same.

" 2. That an assignment of an exclusive right to use a machine, and to vend the same to others for use, within the specified territory, does authorize an assignee to vend elsewhere, out of the said territory, plank, boards, and other materials, the product of such machine."

Thereupon, leave was granted by the Circuit Court to the defendant, Forsyth, to amend his plea, and to the complainant to amend his bill.

And thereupon the complainant amended his bill, —

1. By charging that the mutual deed between Woodworth and Strong of the one part, and the assignees of Emmons's patent (before mentioned), was procured by the latter by fraud upon Woodworth and Strong, not discovered until the extension of the patent.

2. That the defendants had put in operation one new machine since the extension of the patent of 1842 took effect, and that they had rebuilt, by the addition of new parts, being substantial parts of Woodworth's invention, the old machines which they had in actual use at the expiration of the first term of the patent, so that they were practically no longer the same machine ; and thus that the use of those machines, under the color of machines which had been in actual use at the expiration of that term, was a fraud upon the law.

Issue was joined upon these new matters. Evidence was taken upon them, as well as upon the question of the extent of infringement.

It is not necessary to insert this evidence, because the substance of it is stated in the opinion of the court.

On the 4th of May, 1849, the cause came on to be heard before the Circuit Court, upon the bill, answers, replication, exhibits, and evidence, when the court decreed that the bill should be dismissed.

The complainant appealed to this court.

The cause was argued by *Mr. Seward* and *Mr. Webster*, for the appellant, and by *Mr. Gilpin* and *Mr. Westcott*, for the appellees.

The counsel for the complainant contended, —

1. That the mutual deed executed by and between William Woodworth, James Strong, and William Tyack, D. H. Toogood, Daniel Halstead, and Uri Emmons, was procured from the said Woodworth and Strong by fraud, and is therefore void; and that this fraud vitiates and avoids the defendants' title or right to the use of Woodworth's invention.

2. That the defendants' machines are used in fraud of the law, and in violation of the complainant's rights.

In support of the first proposition it was urged, that Woodworth was the inventor of the machine, which was of great value, and that the consideration which was received by Woodworth and Strong in the mutual deed, viz. that of receiving an assignment of Emmons's rights, was of no value whatever, because Emmons had no rights to convey; and that this was an intentional fraud upon Woodworth and Strong, practised by Toogood, Halstead, and Tyack. It was also urged, that the fraud thus established vitiated and avoided the claim of the defendants, because the mutual deed secures no part of the franchises of the extended term to assignees of the first term. Whatever they have is derived only from the proviso in the eighteenth section of the act of July 4, 1836. Those claiming the benefit of the extension must be lawfully possessed of the right at the close of the first term. But they acquire that interest only by virtue of a valid assignment. It must be a lawful title, capable of carrying all the incidental advantages, whether conferred by the deed or conferred by law.

Proposition II. The defendants' machines are used in fraud of the law, and in violation of complainant's rights.

The thing patented means the machine, which is a thing that produces, and is not itself a product. It is proved that a set of knives for surface work will do good work for from sixty days to three months. That a Woodworth machine cannot be operated more than three months, without making the service knives, and the cutters for tonguing and grooving, anew.

In the case of Wilson *v.* Rousseau and Easton, 4 Howard, 646, it was held that, under the eighteenth section of the act of 1836, the exclusive right to make, use, and vend the thing patented is vested in the patentee, with a reservation in favor of the assignees or grantees of the right to use the thing pa-

tented.   That is to say, all assignees or grantees of the right
to use the thing patented, who had machines in use at the time
of the renewal, are by this reservation protected in the con-
tinued use of the specific machine or machines, but specially
excluded from the right to make.

The reservation is specially limited to the continued use of
the thing patented.

Mr. Justice Nelson, in the case referred to, (4 How. 646,)
says,—"The clause, in terms, seems to limit studiously the
benefit, or reservation, or whatever it may be called, under or
from the new grant, to the naked right to use the thing pat-
ented ; not an exclusive right even for that, which might de-
note monopoly.   Nor any right at all, much less exclusive, to
make and vend.   That seems to have been guardedly omit-
ted."

There is a broad distinction between the continued use of
the invention, and the continued use of the machine patented.
The former necessarily carries with it the right to construct,
whilst the latter excludes it.   This distinction is clearly drawn
by Mr. Justice Nelson in the same case (4 How. 683).   He
says,—"It may be said that the 'thing patented' means the
invention or discovery, as held in McClurg *v.* Kingsland, 1 How.
202, and that the right to use the 'thing patented' is what, in
terms, is provided for in the clause.   That is admitted ; but the
words, as used in the connection here found, with the right
simply to use the thing patented, not the exclusive right, which
would be a monopoly, necessarily refer to the patented ma-
chine, and not to the invention ; and indeed it is in that sense
that the expression is to be understood, generally, throughout
the patent law, when taken in connection with the right to
use, in contradistinction to the right to make and sell."   Again :
—"The 'thing patented' is the invention ; so the machine is
the thing patented, and to use the machine is to use the inven-
tion, because it is the thing invented, and in respect to which the
exclusive right is secured, as is also held in McClurg *v.* Kings-
land.   The patented machine is frequently used as equivalent
for the 'thing patented,' as well as for the invention or discov-
ery, and no doubt, when found in connection with the exclu-
sive right to make and vend, always means the right of prop-
erty in the invention,—the monopoly.   But when in connec-
tion with the simple right to use, the exclusive right to make
and vend being in another, the right to use the thing patented
necessarily results in a right to use the machine, and nothing
more."   It is therefore unquestionable, under this ruling of the
Supreme Court, that the reservation is strictly limited to a right

to the continued use of the specific machine or machines legally in use at the time of the renewal.

Let us ascertain with precision what this reservation is. It is not a reservation of the entire right to use the invention, as was ruled in the case of McClurg v. Kingsland, for the doctrine on which that case rests was expressly ruled out in the case of Wilson v. Rousseau and Easton, and the reservation expressly limited to the continued use of the specific machine or machines in existence at the time of the renewal.

It necessarily results from this ruling, that the reservation applies only to such inventions as are embodied in tangible, material form. Processes which are only directory, and simply teach how a product or result is to be obtained, do not come within the reservation, because these have no visible material existence ; — such, for instance, as the process of tanning leather by submitting hides to the chemical action of a solution of such substances as contain the tannin principle ; the process of curing India-rubber by mixing it with sulphur, and then subjecting it to the action of artificial heat, by which process this valuable substance is so changed as not to be affected by the changes of temperature, and by which it is also rendered insoluble ; the various processes of bleaching fibrous and textile substances ; the processes of fixing colors on fabrics by the use of what are called mordants, which, by their chemical action on the colors, render them insoluble in water ; Daguerreotyping, which consists in preparing the surface of a metal plate, with certain chemical agents, to render it so sensitive to the chemical action of light as to receive the impression of the lights and shadows of any object reflected on its surface ; and a variety of other processes in the useful and fine arts, too numerous to specify, but which present some of the greatest triumphs which modern inductive science has applied to the wants of man.

All these do not come under the reservation of the 18th section of the act of 1836, as expounded in the case of Wilson v. Rousseau and Easton, because they have no tangible material existence. They are simply mental processes, which direct how and what matters to treat to produce the required results, and when the results are produced there is an end of the thing patented. True, the application of the process may require complex and costly apparatus ; but unless such apparatus, as is sometimes the case, be not in itself the subject-matter of patent, the reservation does not apply, for the thing patented at the time of the renewal has no material existence. It is the thing patented, when existing in a material form at the time of the

10 *

new grant, to which the reservation applies alone, and not to the invention irrespective of this material existence.

True, the licensee or grantee of the right to use the invention may have invested thousands of dollars in the erection of costly apparatus by which to apply a patented process, such costly apparatus not being the subject-matter of the patent, and the moment the patent is renewed the costly apparatus becomes useless as regards its use under the license, but nevertheless it is not a waste, for the value of the patent to the patentee arises from the fact that it is vendible, and both the invention and the apparatus used in the application of it, being vendible things, can become the subjects of barter and sale.

We have thus shown that the reservation applies only to one class of inventions, namely, such as require the investment of capital in the thing patented; for there is a broad distinction between the investment of capital in the thing patented, and in apparatus and appliances for the application of the thing patented. For instance, the reservation does not apply nor look to the capital invested in workshops, warehouses, and the preparation of operatives to conduct a patented process. A licensee under the patent for casting iron rolls, which was the thing patented in the case of McClurg *v.* Kingsland, may have expended thousands of dollars in the erection of workshops, in flasks and other moulds for casting chilled rolls under that patent, and in the preparation of operatives for carrying into effect the thing patented, but the moment the first term of the patent expires, and it is renewed, he cannot claim the right to the continued use of the invention under the renewed term, because the thing patented perishes or is destroyed by the act of a single use. It consists in so moulding the sand in which the roll is to be cast, as to make the channel through which the molten iron is to be poured into the moulds a tangent to the circle, that, in running in, it may take a whirling or circular motion, and thus, by the law of centrifugal force, throw the heavier or denser particles of iron outward, to form the outer surface of the roll or cylinder, the dross and less pure particles going towards the centre. In this case, the thing patented has no material existence beyond the single use. The moment the effect is produced, the thing patented is at an end; for the mould, being made of sand, is destroyed by the very act of producing the effect, and must be made over again for another application of the thing patented.

We shall allude again to this particular case in an after part of the argument.

As the reservation applies only to things patented which have a material, tangible existence, the question arises, in such cases, How long does this reserved right to use continue, or when does it expire ? If it was a reservation to the right of the invention, as contended for by those who cited the case of McClurg v. Kingsland in the argument in the case of Wilson v. Rousseau and Easton, most unquestionably it would be without limit; but that was overruled by the Supreme Court, because of the broad distinction between the right to the invention, and the right to the continued use of the material machine patented, as we have already shown. Now, then, when does this reserved right to the continued use of the material machine patented cease ? If it was coupled with the right to make, still it would be without limit.' But as it was expressly ruled that the right to make is an exclusive right vested in the patentee, as a necessary consequence the reservation must expire with the existence of the material thing patented ; the one, being an entire dependant of the other, must of necessity expire with it, as the branch dies with the trunk.

When the thing patented no longer has material existence, there is no longer any reserved right. This brings us to the inquiry, When does the material thing patented cease to exist ? The answer to this inquiry must clearly be, and can only be, when it is worn out or destroyed. For when, by any event, the material thing patented no longer exists, it can only be renewed under the authority of the exclusive right to make the thing patented, and therefore the reserved right expires the moment that the material thing patented is worn out or destroyed. This is manifest, and there is no flying from the conclusion.

This brings us to the final and most important branch of the argument. When does the material thing patented cease to exist ? To ascertain this, we must first determine what is the thing patented, for we must first know that a thing was, before we can know that it is no more. That the thing patented is the thing invented, we have before shown to be the doctrine of the court in Wilson v. Rousseau and Easton.

Woodworth did not invent the frame, the cog-wheels, and shafts, and other elementary parts, which, when put together, constitute what is known as the Woodworth planing-machine. These are the mere appliances, — the mere elements of machinery, — which are as free for every man to use as the air he breathes. Nor did he invent the roller for making pressure to control the plank, nor the cutting instruments for planing, nor the cutter-beads or stocks to which the cutters are attached.

These, too, are public property, and at every man's command, to be freely made. and used. As he did not invent any of these, and does not claim them in the letters patent as the thing patented, so the making of them does not come within the exclusive right to make, vested in the administrator by the renewal of the patent ; nor does the use of them require the reservation of the statute. What, then, is the thing patented ? Why, simply the combination of the cutting instruments or planes with the pressure-roller, or an analogous device. The combining or putting these together, to effect the planing of planks, is the thing patented, because it is the thing invented ; and in this sense the thing invented is the thing patented. As the making these things separately is not making the thing patented, the act of combining or putting them together, so that they shall be able to effect the planing of planks, is alone the making of the thing patented, the doing which is the exclusive privilege of the patentee.

If, then, as must be obvious, the putting or combining of these elements together in one machine is the making of the thing patented, then the converse of the proposition must also be true ; namely, that the moment this combination ceases to exist, so soon the thing patented is extinct, and can only be renewed by the exercise of the right to make. We do not press this to the technical length of asserting that the simple act of disconnecting these elementary parts, such, for instance, as temporarily taking the roller or the cutting instruments out of the machine, destroys the thing patented, for that is merely a temporary act, with the intention to restore. But when any one of these elements is either worn out by use, or otherwise destroyed, then the combination invented — the thing patented — no longer exists, and cannot be restored without the exercise of the right to make. The capital which has been invested — not in the appliances to, but in the thing patented — has performed its office ; it has lasted its days and vanisned, and with it the reserved right which belonged to it alone. But, it may be said, it is a hardship for the man who invested his capital in the purchase of an entire machine, that he should be deprived of the use of it because one part only has worn out. The question of individual hardship cannot control the settlement of great legal questions. In the language of Mr. Justice Nelson in Wilson *v.* Rousseau and Easton, " We must remember that we are not dealing with the decision of the particular case before us, though that is involved in the inquiry, but with a general system of great practical interest to the country ; and it is the effect of our decision upon the operation of the sys-

Wilson *v.* Simpson et al.

tem that gives to it its chief importance." If the question of pecuniary hardship could have a legitimate influence, it would not be difficult to demonstrate how much greater the hardship is to the patentee, by reason of the reservation under the most limited construction, than on the part of the grantee, by reason of the loss of the remnant of the machine, after the thing patented is worn out. But what becomes of the question of hardship in other cases where the thing patented has no material existence, as in the case of a chemical process requiring costly apparatus for the application of the process, which is the thing patented?

Let us take, for illustration, the patent granted to Charles Goodyear, for curing, or, as it is termed, vulcanizing India-rubber, by mixing it with sulphur, and then baking it by exposure to heat. The thing patented in this instance is a process, an immaterial thing which has no visible existence. It is simply a rule of procedure. But this rule of procedure can only be applied to produce the desired effect by means of costly machinery for grinding and mixing the India-rubber and sulphur, and moulds, and ovens, or boilers, for baking. Many manufacturers have been licensed to work under this patent. By reason of great poverty, occasioned by many years of fruitless experiments in search of this great discovery, he was compelled to grant licenses far below their actual value. Should he obtain a renewal of this patent, as the thing patented is not a machine, and has no material existence, the licensees or grantees will not come under the reservation, will not the pecuniary loss to them be greater than any that can be sustained by the grantees under the Woodworth patent? Most assuredly it will, and yet for these there will be no remedy. They, however, as the grantees under the Woodworth patent, have received more than their reward; and so it will always be in similar cases, because none but valuable inventions can be renewed, and when the inventions have been of sufficient value to authorize the renewal, those who have used them have been remunerated.

But, as we before submitted, the hardship to the licensee or grantee is not a matter that can affect the judicial construction. The inquiry must look to the naked fact, when the material machine or thing patented ceases to exist.

(The counsel then proceeded to illustrate the above principles by other examples.)

The counsel for the defendants made the following points.

I. The Circuit Court, as a court of equity, had no jurisdiction under the acts of Congress, the parties not being citizens

of Louisiana, the subject of controversy not arising there, the equitable relief not being applicable there, and the right of the complainant riot having been established at law.   Act of 1789, § 11 (1 Stat. at Large, 78); Act of 1793, § 5 (1 Stat. at Large, 322); Act of 1800, § 3 (2 Stat. at Large, 37); Act of 1819, § 1 (3 Stat. at Large, 481); Act of 1836, § 17 (5 Stat. at Large, 124); Act of 1839, § 11 (5 Stat. at Large, 354).

II. If the Circuit Court possess the fullest equitable jurisdiction, still the complainant cannot, on the general and well-settled principles which govern the interposition of a court of equity, obtain redress by such a bill; nor is he entitled to such relief as he asks.

He must establish at law the infringement of his right to the "thing patented," the illegal use thereof by the defendants, and the damages he has sustained thereby.   His right in equity is merely to restrain the continued illegal use of the thing patented, when so established.

By what principle or rule, governing a court of equity, can he ask it, in an action such as this, and between these parties, to declare an agreement between other parties, and all rights under it, void?

What part of the patent law entitles the complainant to an account?

How are damages for the infringement to be obtained by proceedings in equity?   Act of 1836 (5 Stat. at Large, 117, 123); 2 Story's Eq. § 794 *et seq.*, § 934; Dwarris on Statutes, 744; Curtis on Patents, 358, 370, 375, 381, and cases cited; Phillips on Patents, 452; Whittemore *v.* Cutter, 1 Gallison, 429; Miller *v.* Taylor, 4 Burr. 2400; Hill *v.* Thompson, 3 Meriv. 622; Bailey *v.* Taylor, 1 Russ. & Mylne, 74; 3 Mylne & Craig, 735; 4 Mylne & Craig, 435, 487; 1 Woodb. & Min. 435, 220, 280, 290, 376; 2 Woodb. & Min. 28.

III. The complainant has no title on which he can found an action against the defendants.   They claim no interest adverse to his.   He holds the exclusive right to make, use, and vend the machines in Escambia County, Florida, under the new or extended grant.   These machines are not made or used in contravention of that grant; they are no infringement of "the thing patented" to him; the defendants have not made, used, or sold the thing patented to him.   The act of 1836, § 14, (5 Stat. at Large, 123,) establishes his right to sue, and cannot be construed to embrace a machine, lawfully made, before his grant accrued.   Wilson *v.* Rousseau, 4 How. 681, 682, 684; Jacob's Law Dict., *Quitclaim, Assignment.*

IV. Nor is the machine used by the defendants proved to be identical with that to which the complainant claims the exclusive right.

They held under the patent of Emmons as much as that of Woodworth; both patents were identical in many respects; the testimony is entirely imperfect and insufficient so far as it describes the exact character or construction of the machines used by the defendants.

Woodworth purchased the right to use Emmons's patent during the existence of his first grant, and held this right when the defendants took their assignment; there is no proof, in this action, to show how far the defendants' machines, though called "Woodworth's," were made under one right or the other. The only "Woodworth machine" traced to the possession of the defendants never was used by them.

V. The right of defendants to use Woodworth's planing-machine (whether constructed under Woodworth's patent exclusively, or under that and Emmons's combined) in Escambia County, Florida, was completely vested on the 1st of June, 1836. The assignments were according to law. Act of 1793, § 4 (1 Stat. at Large, 322).

The claim of title, as set out in the record, is complete. The agreement of 28th November, 1829, is founded on a full and legal consideration; the attempt to establish its invalidity on the ground of fraud is totally unsustained by any evidence, and at variance with the whole conduct of Woodworth and the character of his proceedings. The assignments subsequent to the agreements are in due form; they were all duly recorded, though this was not required by any act in existence at the time when the title of Forsyth was complete.

But it is altogether immaterial in this suit whether this be so or not. The complainant (Wilson) cannot avail himself of it. The machine is no infringement of his right. It was erected and used under Woodworth's right; it was in being when that terminated. If illegally used, it was and is an infringement of that right, — not of the complainant's; and to Woodworth and his representatives alone belongs the claim for redress.

VI. After the decision of this court (Simpson v. Wilson, 4 How. 711), it is needless to answer the allegations of the bill which charge the act of vending the products of the machine elsewhere than in Escambia County as an infringement. That decision has conclusively affirmed his right to do so.

VII. The right of the defendants, as established by the act of 1836, and confirmed by the Supreme Court, is the right to

"continue to use" the "thing patented" to the extent of their interest therein. This is all they have done; they have not exercised, during the renewed term, any other right derived under the assignment; they have not made or vended any machine; they have merely continued to use that which they had in use when the original term expired.

The attempt to sustain the allegations of the bill, which charge the defendants with fitting up new machines since the 27th of December, 1842, or so reconstructing the old ones, since that time, as to make them essentially new ones, has totally failed. The evidence produced by the complainant negatives the allegations on both points. In allowing the continued use of the machines in existence on the 27th of December, 1842, this court evidently contemplated such repairs as were required to preserve them. Wilson *v.* Rousseau, 4 How. 707 ; Woodworth *v.* Curtis, 2 Woodb. & Minot, 528 ; Boyd *v.* Brown, 3 McLean, 295 ; Boyd *v.* McAlpin, 3 McLean, 427.

Mr. Justice WAYNE delivered the opinion of the court.

In the argument of this case, the counsel for the appellant put his right to the relief sought by his bill upon two points. We will consider them in the order in which they were presented.

The appellant's first point is, that the title and right of the defendants to use the Woodworth invention are taken from them by the fraud and artifice of Emmons, Tyack, Toogood, and Halstead, in procuring from Woodworth and Strong the deed of the 28th of December, 1829. (Rec. 51, 52.)

The fraud alleged in the bill is, that Emmons, having pirated Woodworth's invention, contrived, by misrepresentation, to get a patent for the same, and, in conjunction with Toogood, Halstead, and Tyack, falsely and fraudulently represented to Woodworth, and to Strong, his assignee, that Emmons was the first inventor of the planing-machine, for which Woodworth had received the first patent; and that Woodworth and Strong, regarding it possible that such might be the fact, not suspecting any fraudulent device, and fearing, notwithstanding Woodworth knew the invention to be his own, it might be established against him, executed the agreement of the 28th of November, 1829, for which no other consideration was received than Emmons's pirated patent.

The case is before us upon the original bill, and as it was afterwards amended, upon answers and replication. The defendants traverse this allegation of fraud, as fully as persons so situated can do, and deny any notice or knowledge about it, when they became the assignees of the invention for a valua-

ble consideration.    The complainant, then, must establish his charge by proofs.    We think it has not been done.

The proof relied upon is, that, though Emmons received a patent for what he claimed to be his invention, it was subsequently proved to be identical with the principle of Woodworth's machine, and had been pirated from it.    That, at the time Emmons applied for a patent, he had not, in any way, carried his machine into such a practical result, either in a model or execution, as to entitle him to letters patent.    To this is added the declaration of two witnesses, Harris and Gibson, in a joint deposition, — (one of them we may suppose interested, from not having disavowed it, as his associate Gibson does,) — "that they called upon Emmons in the city of New York, several years since, and shortly previous to his death, for the purpose of obtaining information in relation to an invention of a planing-machine, said to have been invented by him while residing at Syracuse.    That he then informed them, that in the year 1824, being engaged in the erection of salt-vats at Syracuse, he had contrived a machine by which the plank used for salt-vats could be joined by means of knives upon a revolving cylinder.    That he went so far as to satisfy himself, that boards and plank might be joined in that way; but the machine was never so far completed as to perform work with it; that he left Syracuse in July, 1824, and thought no more of the subject, until after William Woodworth had obtained his patent, when he was employed by Toogood, Tyack, and Halstead to defeat it."

Such is the testimony in this record in support of the charge, that the mutual deed of the 28th of November, 1829, was obtained by fraud.    It is under that deed that the defendants claim the right to use the Woodworth machines in their possession.

Apart from the insufficiency of such testimony, in combination or separately, to establish the fraud, if we suppose it had been sworn to by Emmons, it would be only hearsay, and not within any exception to the rule rejecting hearsay testimony. It is not so, on account of its being a dying declaration, or one made by Emmons at variance with his interest.    Neither can it be brought under the exception, as an admission by one who is a party to a suit with others identified in interest with him; nor as coming from one having any interest in the suit, without being a party to the record with others who are so. And it is not the admission of one interested in the subject-matter of the suit, where the law, in regard to that source of evidence, looks chiefly to the parties in interest, and gives to

their admissions the same weight as though they were parties to the record.

In fact, the declaration said to have been made by Emmons is merely hearsay; it cannot be made evidence for any purpose, of itself, or in connection with any other proof in the case not liable to any objection; it can neither aid nor be aided by other evidence.

We have put its exclusion on the ground stated, on account of the relations which the record shows Emmons had with some of the parties, rather than upon the little credit to which such a declaration from him would be entitled, from the difference and opposition between it and such as Emmons must have made when he applied for, and obtained, letters patent for what he claimed to be his invention.

Let us suppose, however, Emmons to be a competent witness to avoid an instrument obtained by the fraudulent devices of himself and his associates; and that there were independent corroborating proofs in confirmation of his credit in such a case.   Still the declaration imputed to him would not, in any way, have disparaged the right or title of the assignees, under the deed of the 28th of December, 1829, their right having been acquired without notice of the fraud which the complainant says was practised upon Woodworth and Strong.

The complainant can have no benefit under the first point urged by his counsel.

The second point upon which the counsel rely is, that the defendants, as assignees under the deed, continue to use their machines, in fraud of the law, and in violation of the rights of the complainant.   The specifications under the general proposition are, that the defendants have substituted other machines for those used by them, before the expiration of the first term of Woodworth's patent.   That they have reconstructed Woodworth's entire combination in the frames of their old machines, or supplied an essential constituent part of it, to continue in use those machines which this court said they had a right to use as assignees, when this case was before it, upon certified points, in the year 1846.   4 How. 709, 711.

There is no proof of either the first or second specification.

But the questions which were argued by counsel, — when repairs destroy identity and encroach upon invention, or when the thing patented ceases to exist, so as to exclude the repair or replacement of any one part of its combination, in connection with the rest of it, not requiring repair, or to be replaced, — are before the court upon the evidence in the record.

We admit, for such is the rule in Wilson *v.* Rousseau, 4

Wilson *v.* Simpson et al.

Howard, that when the material of the combination ceases to exist, in whatever way that may occur, the right to renew it depends upon the right to make the invention. If the right to make does not exist, there is no right to rebuild the combination.

But it does not follow, when one of the elements of the combination has become so much worn as to be inoperative, or has been broken, that the machine no longer exists, for restoration to its original use, by the owner who has bought its use. When the wearing or injury is partial, then repair is restoration, and not reconstruction.

Illustrations of this will occur to any one, from the frequent repairs of many machines for agricultural purposes. Also from the repair and replacement of broken or worn-out parts of larger and more complex combinations for manufactures.

In either case, repairing partial injuries, whether they occur from accident or from wear and tear, is only refitting a machine for use. And it is no more than that, though it shall be a replacement of an essential part of a combination. It is the use of the whole of that which a purchaser buys, when the patentee sells to him a machine ; and when he repairs the damages which may be done to it, it is no more than the exercise of that right of care which every one may use to give duration to that which he owns, or has a right to use as a whole.

This foundation of the right to repair and replace, and its application to the point we are considering, will be found in the answers which every one will give to two inquiries.

The right to repair and replace in such a case is either in the patentee, or in him who has bought the machine. Has the patentee a more equitable right to force the disuse of the machine entirely; on account of the inoperativeness of a part of it, than the purchaser has to repair, who has, in the whole of it, a right of use ? And what harm is done to the patentee in the use of his right of invention, when the repair and replacement of a partial injury are confined to the machine which the purchaser has bought ?

Nothing is gained against our conclusion by its being said that the combination is the thing patented, and that, when its intended result cannot be produced from the deficiency of a part of it, the invention in the particular machine is extinct. It is not so. Consisting of parts, its action is only suspended by the want of one of them, and its restoration reproduces the same result only, without the machine having been made anew. Of course, when we speak of the right to restore a part of a deficient combination, we mean the part of one entirely

original, and not of any other patented thing which has been introduced into it, to aid its intended performance.

Nor is it meant that the right to replace extends to every thing that may be patented. Between repairing and replacing there is a difference.

Form may be given to a piece of any material, — wood, metal, or glass, — so as to produce an original result, or to aid the efficiency of one already known, and that would be the subject for a patent. It would be the right of a purchaser to repair such a thing as that, so as to give to it what was its first shape, if it had been turned from it, or, by filing, grinding, or cutting, to keep it up to the performance of its original use. But if, as a whole, it should happen to be broken, so that its parts could not be readjusted, or so much worn out as to be useless, then a purchaser cannot make or replace it by another, but he must buy a new one. The doing of either would be entire reconstruction.

If, however, this same thing is a part of an original combination, essential to its use, then the right to repair and replace recurs. That this is so may be more satisfactorily shown by the Woodworth planing-machine than any other we know, and particularly by the complaint here made against these defendants.

Woodworth's greatest merit, showing his inventive genius, is the adaptation of a well-known tool to a new form and mechanical action, giving an almost wonderful efficiency to its use, and which, in the hundred efforts which had been made before, had not been accomplished. We mean its cutters for planing, tonguing, and grooving.

The complaint now is, that the defendants, in the use of their old machines, have replaced new cutters for those which were worn out, in fraud of the ruling of this court in its answer to the first point certified when this case was formerly here. Simpson et al. v. Wilson, 4 Howard, 709.

This court then said, that the renewal of the patent granted to William Woodworth, to William W. Woodworth, his executor, did not inure to the benefit of the defendants, to the extent they were interested in it before the renewal and extension, but that the law saved to persons in the use of the machines at the time the extension took effect the right to continue the use. Simpson et al. v. Wilson, 4 How. 711.

Wilson and Rousseau's case, in 4 Howard, was very fully considered by this court. There were differences of opinion between the judges, as to the interest which assignees of an invention had in it under the eighteenth section of the act of

1836, after the expiration of the first term of a patent, when there had been a renewal and extension of it. But it certainly did not occur to either of us, that the language then used by the court, and afterwards in Simpson et al. *v.* Wilson, could make any difficulty in its application, or that it was subject to misapprehension.

It does not permit an assignee of the first term of a patent, after its renewal and extension, to make other machines, or to reconstruct it, in gross, upon the frames of machines which the assignee had in use when the renewal and extension of the patent took effect. But it does comprehend and permit the resupply of the effective ultimate tool of the invention, which is liable to be often worn out or to become inoperative for its intended effect, which the inventor contemplated would have to be frequently replaced anew, during the time that the machine, as a whole, might last.

The proof in the case is, that one of Woodworth's machines, properly made, will last in use for several years, but that its cutting-knives will wear out and must be replaced at least every sixty or ninety days.

The right to replace them was a part of the invention transferred to the assignee for the time that he bought it, without which his purchase would have been useless to him, except for sixty or ninety days after a machine had been put in use. It has not been contended, nor can it be, that such can be a limitation of the assignee's right in the use of the invention.

If, then, the use of the machine depends upon the replacement of the knives, and the assignee could replace them from time to time, as they were needed, during the first term of the patent, though they are an essential and distinct constituent of the principle or combination of the invention, frequently replacing them, according to the intention of the inventor, is not a reconstruction of the invention, but the use only of so much of it as is absolutely necessary to identify the machine with what it was in the beginning of its use, or before that part of it had been worn out.

The right of the assignee to replace the cutter-knives is not because they are of perishable materials, but because the inventor of the machine has so arranged them as a part of its combination, that the machine could not be continued in use without a succession of knives at short intervals. Unless they were replaced, the invention would have been but of little use to the inventor or to others. The other constituent parts of this invention, though liable to be worn out, are not made with reference to any use of them which will require them to be

11 *

replaced. These, without having a definite duration, are contemplated by the inventor to last so long as the materials of which they are formed can hold together in use in such a combination. No replacement of them at intermediate intervals is meant or is necessary. They may be repaired as the use may require. With such intentions, they are put into the structure. So it is understood by a purchaser, and beyond the duration of them a purchaser of the machine has not a longer use. But if another constituent part of the combination is meant to be only temporary in the use of the whole, and to be frequently replaced, because it will not last as long as the other parts of the combination, its inventor cannot complain, if he sells the use of his machine, that the purchaser uses it in the way the inventor meant it to be used, and in the only way in which the machine can be used.

Such a replacement of temporary parts does not alter the identity of the machine, but preserves it, though there may not be in it every part of its original material.

Such being the case, and this court having determined that the statute providing for the extension and renewal of patents saves the rights of assignees in the use of the machines which they may have in operation when the extension takes effect, we do not think that the defendants in this case, from having replaced cutter-knives in their machines, have been using them in fraud of the law, or in violation of the rights of the complainant.

We shall, therefore, direct the decree of the court below, dismissing the complainant's bill, to be affirmed.

## Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Louisiana, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs.