## EL DORADO FOUNDRY, MACHINE & SUPPLY CO. v. FLUID PACKED PUMP CO. et al. *

### No. 10407.

Circuit Court of Appeals, Eighth Circuit.

Feb. 24, 1936.

James A. Carr, of St. Louis, Mo. (M. P. Matheney, of El Dorado, Ark., W. H. Rector, of Little Rock, Ark., and Joseph J. Gravely, of St. Louis, Mo., on the brief), for appellant.

William L. Connor, of Los Angeles, Cal., for appellees.

Before GARDNER, WOODROUGH, and THOMAS, Circuit Judges.

THOMAS, Circuit Judge.

This is an appeal from an interlocutory decree enjoining the appellant from infringing either directly or contributorily patent No. 1,549,175, and adjudging that appellees recover damages and profits. A special master was appointed to take and report an account of such damages and profits.

The patent in question is for an "Improvement in Double-Acting Hollow-Plunger Pumps." The patent was granted to appellee Joseph G. Richardson as assignee of the joint inventors, Edward T. Adams and John B. Reilly. Richardson granted an exclusive license to his coappellee, Fluid Packed Pump Company.

While the decree enjoins infringement of all the claims of the patent, the testimony at the trial and the briefs of counsel refer principally to claims 5, 6, and 9.

*Rehearing denied April 3, 1936.

Claims 5 and 9 are sufficient to give a clear understanding of the questions involved. They are as follows:

"5. In a pump, two relatively reciprocal members, each member having two spaced concentric annular walls, each of the walls of one member being disposed in close proximity to a corresponding one of the walls of the other member whereby an isolated annular space is provided which increases and decreases with relative reciprocation of the members, the innermost of the walls providing a central fluid course, and spaced discharge valves within said fluid course, one of the walls being provided with a constantly open port leading from the said otherwise isolated space into the fluid course at a point intermediate of the two valves. * * *

"9. A pump plunger for pumps of the character described, embodying an outer tubular member and an inner tubular member; said plunger providing a central fluid course, a pair of spaced upwardly opening nonreturn valves for controlling flow of fluid in said fluid course, and a port penetrating the inner tubular member at a point intermediate of the said two valves."

The pump is intended and used primarily for pumping oil from wells in the oil fields. The invention consists of the particular combination of the parts of the pump and not in any new part. All the parts are old and have long been in use in other pumps used for the same purpose. The particular virtue claimed for this pump is its superior utility over its competitors where sand is present in the fluid to be pumped.

The question of the validity of the patent is raised in argument, but its validity was stipulated at the trial, and evidence was not taken upon this issue. We, therefore, assume validity and consider only the issues submitted to the lower court.

For a clear understanding of the alleged infringement, only a brief description of the parts involved and their operation is necessary. The pump is made in different sizes from 2 inches to 4 inches in diameter and from 11 feet 6 inches to 15 feet in length. When in use, it is lowered to the bottom of the well and is connected with the surface of the ground by a pipe through which the fluid being pumped passes. The fluid is admitted at the bottom of the pump through a "standing valve," consisting of a metal ball and seat, and is forced out through the top into the pipe leading to the surface of the ground. There are three valves including the standing valve just described; the other two are similar and are called traveling valves. The valves co-operate in a combination of three upright pipes, the first of which is rigid and is attached to the bottom of the pump. The other two are traveling pipes and are attached to a cage at the top of the pump. The cage and the two traveling pipes constitute the plunger. One of the traveling pipes is inside the standing pipe and the other outside. There are ports in the upper part of the inner pipe permitting the fluid to pass through at that point.

On the upward stroke of the plunger the standing valve and the valve at the bottom of the plunger open and the fluid passes into the "fluid course" in the center of the pump and through the ports, filling the space left vacant between the two pipes of the plunger above the standing pipe. This is due to the fact that the fluid outside the pump is subject to greater pressure than that on the inside. On the downward stroke the lower traveling valve remains open, the standing valve closes and the valve located in the cage at the top opens. The fluid which on the upward stroke had passed through the ports above the standing pipe is forced back through the ports into the fluid course and out at the top of the pump through the valve in the cage.

It is obvious that the utility of the pump depends upon the close-fitting condition of the pipes of the plunger with the standing pipe and of the perfection of the balls and seats comprising the valves. If there be a sufficient leak at any of these points, the apparatus will only churn the fluid in the well and will not force it upward and out.

The parts of all pumps of the same size are interchangeable. In use the valves first wear out, when the pump may be repaired by purchasing new balls and seats and restoring them. Such parts are recognized articles of commerce, and the appellees make no objection to the owners of the pumps replacing them as often as need be. The next parts to wear out are the three pipes which slide upon one another. When sand is present in the fluid being pumped, they wear thin, thus enlarging the space between them and al-

lowing the fluid to leak resulting in a corresponding loss of function. All other parts of the pump will last indefinitely. The life of the pump without repair depends upon the amount of sand in the fluid, and is from twenty-four hours to about one year. If the valves are replaced as they wear out and the parts of the pipes which are worn restored, the life of the whole pump will be prolonged accordingly.

The appellees, owners of the patent, manufacture the pumps and sell them without restriction to the oil companies for use. The appellant owns and operates a machine shop in the oil fields of southern Arkansas, and is engaged in repairing all kinds of machinery used in and about the oil wells. The work which it does to which the appellees object relates to the three pipe combination described above. When one or more of the pipes is worn so that the function of the combination is impaired, the owner sends it to the shop for repairs. When the pump arrives at the shop, it is taken apart, cleaned, and examined to determine its defects. When it is found that the tubes are so worn as to permit the oil to pass between them, the standing pipe, or tube, is cut off and an oversize pipe is welded on to replace it. If the outer or inner pipe is worn, it is replaced by the same means. Sometimes only a small part of a pipe is replaced. At times two of the three pipes are replaced; at other times only one or a part of one. Only in one instance has the appellant replaced the three pipes on the same pump. The piping used is all commercial piping bought in the open market and usable for any purpose to which it is adapted.

■ The appellant has never made an entire pump nor sold one. It is not, therefore, guilty of direct infringement. "The absence of a single material mechanical element of a patented combination from the machine or combination that is alleged to infringe it is fatal to the claim of infringement." Whitney v. New York Scaffolding Co., 243 F. 180, 186 (C.C.A.8).

■ The charge relied upon by appellees to support the decree is contributory infringement. "Contributory infringement," as defined in Walker on Patents (6th Ed.) p. 552, § 457, "is intentional aid or cooperation in transactions, which collectively constitute complete infringement."

Counsel for appellees state their claim concisely as follows:

"With respect to the devices here in question, the purchasers and users are the real infringers, for it is they who ultimately complete the rebuilt combinations and use the unauthorized, infringing pumps, but the defendant, in soliciting and doing the unauthorized work of rebuilding for the purchasers or users, thereby becomes a contributory infringer and is equally liable to the plaintiffs for such rebuilding."

The charge against appellant, therefore, consists of two elements: First, the "intentional" supplying of parts to the owners and users of the pumps who recombine such parts into a new or rebuilt pump; and, second, the rebuilding of the pumps in their shop under the guise of making repairs.

■ As to the first element of the charge, "intention" is the gist of the offense. Judge Walter H. Sanborn, speaking for this court in Whitney v. New York Scaffolding Co., 243 F. 180, 185, said:

"The question in contributory infringement is whether or not the defendant made or sold his machine or improvement with the intent or purpose of aiding another in the unlawful making, selling, or using of a third person's patented invention. The burden is on the plaintiff to establish the affirmative of this issue. * * * But the mere fact that it is capable of such a use, when it is at the same time capable and fitted for a rightful and innocent use, is not sufficient to establish such an intention or purpose where, as in this case, the evidence is that the machine and its parts were expressly fitted for use in a rightful way without aiding in any such infringement, and there is no evidence that the defendant ever knew of the use of the machine, or that it ever was sold or used in such a way as to aid others in infringing the patented invention."

Here this indispensable element is entirely wanting. The trial court found, and we think rightly so, that:

"Everything done by the defendant, its officers and agents, was in the utmost good faith, and in the belief that it had the legal right so to do, and was without any intention on its part or the part of its officers and agents, to infringe upon any of the rights of the plaintiffs and in utter

ignorance that any of its said acts constituted an infringement."

It follows that appellees have not sustained the burden placed upon them by law upon this element of the charge.

■ There remains for consideration the question, as stated by counsel for appellees, "whether the conduct of the defendant (appellant), as established by the evidence, constitutes lawful repair or unlawful rebuilding of plaintiffs' (appellees') patented pumps."

The appellant knew what it was doing in making the changes in and supplying the parts for the pumps at its machine shop. It must be presumed to have intended to effect the natural result of its acts in so far as they affected the pumps before they were removed from its shop and returned to the owners in the oil fields. The appellant claims that the work done by it and the supply by it of unpatented pipes, or tubes, or of pieces of tubes to take the place of worn tubes constituted repairs only, while the appellees claim such conduct constituted an unlawful reconstruction or rebuilding of the pumps. The facts as to what was done are not in dispute. They are detailed above. Upon the basis of the undisputed facts, we are of opinion that the contention of appellant is correct; that under the law the pumps are repaired only and not reconstructed; and that the decree of the trial court should be reversed.

In the case of Leeds & Catlin Company v. Victor Talking Machine Company, 213 U.S. 325, 336, 29 S.Ct. 503, 507, 53 L.Ed. 816, the Supreme Court said:

"The license granted to a purchaser of a patented combination is to preserve its fitness for use so far as it may be affected by wear or breakage. Beyond this there is no license."

In the same case the court quoted with approval the more definite rule stated in Wilson v. Simpson et al., 9 How. (50 U. S.) 109, 125, 124, 13 L.Ed. 66, that the law does not permit the owner of a patented machine "to make other machines, or to reconstruct it, in gross, upon the frames of [patented] machines. * * * But it does comprehend and permit the resupply of the effective ultimate tool of the invention, which is liable to be often worn out or to become inoperative for its intended effect, which the inventor con-

templated would have to be frequently replaced anew, during the time that the machine, as a whole, might last."

In Heyer v. Duplicator Mfg. Co., 263 U.S. 100, 101, 44 S.Ct. 31, 32, 68 L.Ed. 189, the Supreme Court, speaking through Mr. Justice Holmes, further elaborated this principle as follows:

"Since Wilson v. Simpson, 9 How. 109, 123, 13 L.Ed. 66, it has been the established law that a patentee had not 'a more equitable right to force the disuse of the machine entirely, on account of the inoperativeness of a part of it, than the purchaser has to repair, who has, in the whole of it, a right of use.' The owner when he bought one of these machines had a right to suppose that he was free to maintain it in use, without the further consent of the seller, for more than the sixty days in which the present gelatine might be used up. The machine lasts indefinitely, the bands are exhausted after a limited use and manifestly must be replaced. [Id.] 9 How. 126 [13 L.Ed. 66]. The machine is costly, the bands are a cheap and common article of commerce. In Wilson v. Simpson, the purchaser was held free to replace the cutter knives that were the ultimate tool of the invention."

The evidence shows that the first parts of the pump to wear out are the valves and next the tubes or pipes; that in oil fields where sand is present in the oil, as in southern Arkansas, the tubes wear out in from one to thirty days, while the rest of the pump is still in good condition. That appellees "contemplated" that this would be the result and that it would be necessary to replace the tubes from time to time is shown by their advertising. In their catalogue, furnished their customers, it is said:

"When to Replace Tubes.

"The clearance between tubes on new pumps is twenty thousandths of an inch on the diameter with a variation allowed the manufacturer of five thousandths of an inch either way. No definite amount of wear before replacement of tubes is necessary can be specified. This will vary with the conditions being handled, particularly with the viscosity of the fluid being pumped, and the results secured with the specific conditions being handled will be the best guide. Under ordinary conditions twenty thousandths of an inch wear

beyond the original clearance can occur before any material decrease in efficiency is noticed. In making repairs at the factory, tubes are not replaced ordinarily until the clearance is fifty thousandths of an inch on the diameter, or about thirty thousandths beyond the original clearance, unless it is known that the pump is being used in extremely low viscosity oil in deep wells, in which case they are replaced when the clearance has reached about thirty-five or forty thousandths of an inch."

It is abundantly clear that the appellant is neither a direct infringer nor a contributory infringer in this case. It is neither a manufacturer nor dealer in pumps. It operates a repair shop only. It uses only standard commercial, unpatented material in making repairs. The evidence shows that the cost of making such repairs is small as compared with the cost of new pumps. The parts of the pumps repaired are the parts which wear out quickly and which the appellees contemplated would wear out quickly and might be replaced. That the replacement of worn tubes is regarded by the appellees as a repair only is shown by the statement in their catalogue quoted above wherein it is said: "In making repairs at the factory, tubes are not replaced ordinarily until the clearance is fifty thousandths of an inch on the diameter." The interlocutory decree, therefore, granting an injunction must be reversed, and it is so ordered.