MONROE AUTO EQUIPMENT COMPANY, Plaintiff,

v.

PRECISION REBUILDERS, INC., Defendant.

Civ. A. No. W-2600.

United States District Court
D. Kansas.

March 27, 1964.

Lilleston, Spradling, Gott, Stallwitz & Hope, Wichita, Kan., Harness, Dickey & Pierce, Detroit, Mich., of counsel, for plaintiff.

Hill & Mason, Wichita, Kan., for defendant.

WESLEY E. BROWN, District Judge.

This is an action for trademark infringement, unfair competition and patent infringement. Defendant, Precision Rebuilders, Inc., admitted the allegations of trademark infringement and unfair competition, and plaintiff, Monroe Auto Equipment Company, has waived damages therefor. The present matter of defendant's liability for patent infringement was tried to the court sitting without a jury. The issue of damages for patent infringement has been reserved pending our determination of the liability issue.

Certain admissions have been made by the parties and are found herein accordingly. We find the facts on the issue of liability for patent infringement as follows:

1. Plaintiff, Monroe Auto Equipment Company, a Michigan corporation, manufactures, among other items, approximately 28 models of shock absorber. These are sold both as original equipment to automobile manufacturers and also in the replacement market. Twenty-five models of Monroe's shock absorbers, or approximately 90 per cent of plaintiff's manufacture are covered by either United States Letters Patent No. 2,546,038 or United States Letters Patent No. Re. 23,421, the combination patents here in suit which plaintiff owns. (The three models not covered by either patent are designated by Monroe as models M471, M547 and M548.) These combination patents relate generally to the direct-acting hydraulic type of shock absorber. This type shock absorber embodies, inter alia, the following components: an inner pressure cylinder and an outer reserve chamber, both of which normally contain hydraulic fluid; valve means normally disposed in the lower end of the pressure cylinder to control the interflow of fluid between the pressure cylinder to the reserve chamber; and a piston operable in the pressure cylinder, having valve means associated therewith to control the flow of fluid from one side of the piston to the other during the movement of the piston within the cylinder. The combination patents here in suit relate generally to a combination of valving and restricted orifice control. Defendant does not challenge the validity of these combination patents. Since 1951, Monroe has stamped on the outside of its shock absorbers its name and the numbers of the patents covered thereby.

2. A rubber seal, designated by Monroe by part number 12894, surrounds the shock absorber piston at the upper end of the pressure cylinder and seals in the hydraulic fluid. The seal is made according to Monroe's specifications as to constituent material, shape and dimensions. The seal is designed to last the useful life of Monroe's shock absorber, approximately 40,000 miles, and normally does so. Abrasion by a rusted, pitted or otherwise damaged shock absorber piston rod will damage the seal and terminate the useful life of the shock absorber; on certain models of Monroes a dirt shield aids in protecting the piston rod from damage. As a cause of the termination of Monroe shock absorbers' useful life, seal damage, while being one of several causes, is not a usual nor a particularly significant cause. Monroe does not anticipate that during the useful life of a shock absorber, seal 12894 will be replaced, nor are Monroe shock absorbers otherwise intended or designed to be repaired, although the shock absorber design does not prohibit repair; rather, Monroe intends that at the termination of its shock absorbers' useful life, they will be replaced.

3. Defendant, Precision Rebuilders, Inc., a Kansas corporation organized in December 1960, processes used shock absorbers or "cores" and sells them in the replacement market. Precision originally acquired used shock absorbers by purchase through newspaper advertisement and from junk dealers, salvage yards, garages and similar sources, paying approximately twenty-five cents a piece. Subsequently, Precision bought used shock absorbers on an exchange basis, receiving and giving credit for a core, or charging a fifty-cent "core charge". The used shock absorbers so purchased have been discarded and abandoned by the owner of the automobile from which they have been removed, and are considered by all involved as being useless as shock absorbers, to be thrown away or sold as junk or scrap; automobile owners are not paid for nor given an allowance for used shock absorbers by the garages which remove them and sell them to Precision. A very small per cent of the used shock absorbers thus purchased by Precision are Monroes.

4. Precision's normal processing of used shock absorbers is: clean and degrease the outside of the core; cut one end off; remove and clean all parts; replace any defective parts, including the valves, such as are covered by the combination patents here in suit; replace Monroe's seal 12894 with a neoprene seal of Precision's own manufacture; re-assemble, re-fill, re-weld and re-paint the shock absorber; test the shock absorber for pressure on a machine of Precision's own making against specifications of its own determination; attach a decal showing Precision's name and the word "rebuilt"; box and catalogue the processed shock absorber. When a defective part is replaced, an undamaged part is substituted from a core of the same make and model as the one being processed. In its process, Precision in no way re-engineers nor re-tools the shock absorber nor any part thereof. Approximately two per cent of the used shock absorbers thus processed by Precision are of Monroe Manufacture, and at least one of the Monroe shock absorbers so processed was covered by both of the combination patents here in suit. The only purchased items used in Precision's processing of Monroe cores are the seals and the hydraulic oil, neither of which element in a Monroe shock absorber is covered by the patents in suit specifically; if replacement parts are needed they are substituted as above described, or, if parts are thus available, the core is thrown away.

5. Precision's commissioned salesmen sell the processed shock absorbers to jobbers, warehouses and wholesale parts equipment companies; these purchasers, in turn, sell the processed shock absorbers to dealers, such as service stations and garages.

6. Precision has no license to repair used Monroe shock absorbers.

7. Precision's processing of used Monroe shock absorbers is a reconstruction, rather than a repair, thereof.

## CONCLUSIONS OF LAW

█ Plaintiff contends that defendant's processing of used Monroe shock absorbers amounts to a rebuilding thereof and, accordingly, is an infringement of its combination patents here in suit; defendant contends that its processing is permissible repair. This case presents a question of direct infringement as distinguished from contributory infringement. See 40 Am.Jur., Patents ¶¶ 150, 151.

█ The law is settled that a combination patent covers only the totality of the elements in the claims and that no element, viewed separately, is protected by the patent monopoly, regardless of however essential it may be to the patented combination and no matter how costly or difficult of replacement it may be. Leeds & Catlin Co. v. Victor Talking Machine Co. (1908), 213 U.S. 301, 29 S. Ct. 495, 53 L.Ed. 805; Mercoid Corp. v. Minneapolis-Honeywell Regulator Co. (1943), 320 U.S. 680, 64 S.Ct. 278, 88 L. Ed. 396; Aro Mfg. Co. v. Convertible Top Replacement Co. (1961), 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592, reh. den. 365

U.S. 890, 81 S.Ct. 1024, 6 L.Ed.2d 201. Thus, apart from the question of rebuilding versus repair, no direct infringement of the combination patents arises merely by reason of the replacement of seal 12894, the hydraulic fluid and, occasionally, of valves in the used Monroe shock absorbers.

 By virtue of his letters patent, a patentee acquires the exclusive right to make and to use his patented invention and to sell the same to others to be used for the period of time specified in the patent. But when the patentee sells a patented article, it passes outside of this monopoly and is no longer under the peculiar protection granted to patented rights. By a valid sale and purchase, the patented article becomes the private, individual property of the buyer. The patentee ceases to have any interest whatever in the patented article so sold and delivered, and he can exercise no future control over what the purchaser may wish to do with the article after his purchase. Chaffee v. Boston Belting Co. (1859), 22 How. 217, 16 L.Ed. 240; Mitchell v. Hawley (1872), 16 Wall. 544, 21 L.Ed. 322; United States v. General Electric Co. (1926), 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362. Thereafter, the buyer of the patented article may continue to use it so long as it is capable of use, and he may maintain it, repair it or improve upon it and otherwise preserve its fitness for use so far as it may be affected by wear or breakage as he pleases, in the same manner as if dealing with property of any other kind. When, however, the article is worn out, or substantially destroyed, the buyer's right to use the patented article expires. Chaffee v. Boston Belting Co., supra; Adams v. Burke (1873), 17 Wall. 453, 21 L.Ed. 700; Leeds & Catlin Co. v. Victor Talking Machine Co. (1908), 213 U.S. 325, 53 L.Ed. 816, 29 S.Ct. 503; Heyer v. Duplicator Mfg. Co. (1923), 263 U.S. 100, 44 S.Ct. 31, 68 L.Ed. 189; Aro Mfg. Co. v. Convertible Top Replacement Co., supra.

 In the case of an article covered by a combination patent, when one of the elements of the combination has become so much worn as to be inoperative, or has been broken, the owner who has bought its use may restore it to its original condition. In such a combination, mere replacement of individual unpatented parts, one at a time, whether of the same part repeatedly or different parts successively, is no more than the lawful right of the owner to repair his property. Wilson v. Simpson (1850), 9 How. 109, 13 L.Ed. 66; Aro Mfg. Co. v. Convertible Top Replacement Co., supra; Goodyear Shoe Machinery Co. v. Jackson (C.A.1, 1901), 112 F. 146. But when, in such a combination, the material of the combination ceases to exist, in whatever way that may occur, the right to renew it depends upon the buyer's right to make the invention. If the right to remake does not exist, there is no right to rebuild the combination.

"A purchaser, then, may repair, but not reconstruct or reproduce, the patented device or machine. Repair is 'restoration to a sound, good, or complete state after decay, injury, dilapidation, or partial destruction.' Reconstruction is 'the act of constructing again.' Reproduction is 'repetition,' or 'the act of reproducing.' These definitions are instructive in bringing home to the mind that repair carries with it the idea of restoration after decay, injury, or partial destruction, and that reconstruction or reproduction carries with it the idea of a complete construction or production over again." Goodyear Shoe Machinery Co. v. Jackson, supra, 112 F. p. 150.

 Therefore, the reconstruction by the buyer which will amount to patent infringement is such reconstruction of the entity as to "in fact make a new article"; short of this maintenance of the "use of the whole" of the patented combination through replacement of a spent, unpatented element does not constitute reconstruction. Aro Mfg. Co. v. Convertible Top Replacement Co., supra. As the Supreme Court said in Wilson v. Simpson, supra:

"Form may be given to a piece of any material—wood, metal, or glass—so as to produce an original result, or to aid the efficiency of one already known, and that would be the subject for a patent. It would be the right of a purchaser to repair such a thing as that, so as to give to it what was its first shape, if it had been turned from it, or, by filing, grinding, or cutting, to keep it up to the performance of its original use. But if, as a whole, it should happen to be broken, so that its parts could not be re-adjusted, or so much worn out as to be useless, then a purchaser cannot make or replace it by another, but he must buy a new one. The doing of either would be entire reconstruction.

"If, however, this same thing is a part of an original combination, essential to its use, then the right to repair and replace recurs." 13 L. Ed. pp. 72–73.

See also 40 Am.Jur., Patents ¶¶ 143, 152.

It is impractical as well as unwise to attempt to demarcate verbally a line whereat permissible repair stops and impermissible reconstruction begins.

"Each case, as it arises, must be decided in the light of all the facts and circumstances presented, and with an intelligent comprehension of the scope, nature, and purpose of the patented invention, and the fair and reasonable intention of the parties. Having clearly in mind the specification and claims of the patent, together with the condition of decay or destruction of the patented device or machine, the question whether its restoration to a sound state was legitimate repair, or a substantial reconstruction or reproduction of the patented invention, should be determined less by definitions or technical rules than by the exercise of sound common sense and an intelligent judgment." Goodyear Shoe Machinery Co. v. Jackson, supra, 112 F. p. 150.

Assuming that Precision acquired the same right to repair used Monroe shock absorbers as a purchaser thereof from Monroe possessed, upon the evidence and testimony before us, we hold that Precision's processing of used Monroe cores amounts to impermissible reconstruction, and is an infringement of Monroe's patents. In arriving at this holding, we note, among other factors, that; Monroe does not intend that its shock absorbers be repaired; that the construction of Monroe shock absorbers permits no access to or severance of the working elements by any ordinary method of detachment; that Precision's processing of used Monroe shock absorbers was effected only by cutting and later rejoining the shock absorbers in a manner violative of and unintended by the shock absorbers' construction and design; that seal 12894, which was replaced in all cases, was intended to last the life of the shock absorber and normally did so, and was not merely a temporary part;[1] and that at the time the used shock absorbers were processed, they had fulfilled their intended purpose and had been substantially destroyed as intended, and were considered junk. See American Cotton-Tie Co. v. Simmons (1882), 106 U.S. 89, 1 S.Ct. 52, 27 L.Ed. 79; Davis Electrical Works v. Edison Electric Light Co., supra. On all the facts of the case, the conclusion is inescapable that, far more than maintaining the "use of the whole" of the used Monroe shock absorbers which it processes, Precision resurrects them from the limbo of useless junk and accomplishes a

---

[1]. In Wilson v. Simpson, supra; Heyer v. Duplicator Mfg. Co., supra; Aro Mfg. Co. v. Convertible Top Replacement Co., and in the large number of the reported lower federal court cases, where replacement of an unpatented part in a patented combination was construed as permissible repair, the element replaced was a temporary part, anticipated or intended to become worn out before the combination as a whole. See Davis Electrical Works v. Edison Electric Light Co. (C.A.1, 1894), 60 F. 276; Fromberg, Inc. v. Gross Mfg. Co. (D.C.S.D.Calif., 1962), 210 F.Supp. 741.

second creation of the patented entity. See Aro Mfg. Co. v. Convertible Top Replacement Co., supra.

■■■■ Our decision rests also upon a second and independent ground. The principle that a purchaser of a patented article has the right to repair it during its useful life is based upon the idea that the patentee, in selling his protected article, intends to and does part with the use thereof, and that the buyer intends to and does buy the use of the machine until it wears out or becomes substantially destroyed. For this reason, the license to repair is limited to preserving the article's fitness for use so far as it may be affected by wear or breakage; beyond this there is no license. Leeds & Catlin Co. v. Victor Talking Machine Co., supra. The royalty paid by the buyer is intended by the parties as compensation to the patentee for parting with his exclusive right of use. Mitchell v. Hawley, supra. Thus, in Wilson v. Simpson, supra, at 13 L.Ed. 72, the Supreme Court explains:

> "In either case, repairing partial injuries, whether they occur from accident or from wear and tear, is only refitting machine for use (sic). And it is no more than that, though it shall be a replacement of an essential part of a combination. It is the use of the whole of that which a purchaser buys, when the patentee sells to him a machine; and when he repairs the damages which may be done to it, it is no more than the exercise of that right of care which everyone may use to give duration to that which he owns, or has a right to use as a whole."

Following this explanation, the Court asks a question, the answer to which its previous comments make obvious:

> "And what harm is done to the patentee in the use of his right of invention, when the repair and replacement of a partial injury are confined to the machine which the purchaser has bought?" Id.

In Adams v. Burke, supra, at 21 L.Ed. 703, the Supreme Court, after reiterating that the purchase of a patented machine carries with it the right to the use of that machine so long as it is capable of use, states:

> "The right to manufacture, the right to sell and the right to use are each substantive rights, and may be granted or conferred separately by the patentee.

> "But, in the essential nature of things, when the patentee, or the person having his rights, sells a machine or instrument whose sole value is in its use, he receives the consideration for its use and he parts with the right to restrict that use. The article, in the language of the court, passes without the limit of the monopoly. Bloomer v. McQuewan, 14 How. [539] 549 [14 L. Ed. 532]; Mitchell v. Hawley, ante [16 Wall. 544, 21 L.Ed.], 322. That is to say, the patentee or his assignee having in the act of sale received all the royalty or consideration which he claims for the use of his invention in that particular machine or instrument, it is open to the use of the purchaser without further restriction on account of the monopoly of the patentees."

■■■■ When, however, the article is worn out, or substantially destroyed, the buyer's right to use the article ceases. If the buyer then rebuilds the machine, and thereby makes substantially a new machine, it becomes subject to the patentee's monopoly, the same as in the case of any other person who unlawfully makes the patented machine. Goodyear Shoe Machinery Co. v. Jackson, supra.

■■■■ In the present case, when the automobile owner abandoned his used Monroe shock absorbers, the garage or whomever thereafter first appropriated them, took the owner's right to whatever usefulness as shock absorbers they had remaining. 1 Am.Jur.2d, Abandoned Property, ¶ 18; 1 C.J.S. Abandonment,

§ 9. Like the owner, the garage then had the license to repair; also, it could convey the used shock absorbers and the right to their use, and the license to repair to third persons. But, again like the owner, the garage neither had nor could it convey to others, a right to reconstruct the shock absorbers. Precision, for this additional reason, could not and did not acquire any right to rebuild the used Monroe shock absorbers, as we heretofore have found they did, and for this further reason Precision is liable for infringing Monroe's combination patents here in suit. Champion Spark Plug Co. v. Emener (D.C.E.D.Mich., 1936) 16 F.Supp. 816, is not discordant with our holding.

Lastly, although Precision could acquire from its suppliers of cores the title which, by appropriation of the abandoned shock absorbers, they had therein, if the parties so intended, it is clear and we have so found that the parties intended merely to sell the cores as junk. As a result, Precision acquired only the right to destroy the cores, not to use them.

> "The purchaser of a patented article, from one who is authorized to sell, becomes possessed of an absolute property in it (Keeler v. Standard Folding Bed Co., 157 U.S. 659, 15 Sup.Ct. 738, 39 L.Ed. 848), which he is capable also of transmitting to others, provided, of course, there are no express restrictions. Dickerson v. Tinling [8 Cir.], 84 Fed. 192, 28 C.C.A. 139. Had therefore the machines which are in controversy here been advisedly sold to the junkman, he in turn could have sold them, as he did, to Tomkins or to Tomkins and Arnhold, and the defendant company, buying from them, would undoubtedly have been protected. The complainants having parted with them in this way, if that was the fact, the right of property which thereby passed would have carried with it, as of course, the right of user. But it is manifest that, to have this effect, the sale must have been actually intended, and it must have been of the machines as such,

and not of the dismantled parts as scrap. A sale as scrap was a sale, not to use, but to destroy, and cannot be wrested into a sale of the patented machines, because the different parts could be picked up and put together out of it. Wortendyke v. White, 2 Ban. & Ard. 25; Cotton-Tie Co. v. Simmons, 106 U.S. 89, 1 Sup.Ct. 52, 27 L.Ed. 79" Tindel-Morris Co. v. Chester Forging & Engineering Co. (C.C.Pa., 1907), 163 F. 304.

See also Green v. Electric Vacuum Cleaner Co. (C.A.6, 1942), 132 F.2d 312; Electric Vacuum Cleaner v. Green (D.C.N.D. Ohio, 1941), 41 F.Supp. 562.

Therefore, we hold that defendant Precision Rebuilders, Inc. is liable to plaintiff Monroe Auto Equipment Company for infringement of plaintiff's combination patents here in suit. Plaintiff's counsel will prepare and submit an appropriate order.