## ELECTRO BLEACHING GAS CO. v. MILLER et al.

(District Court, W. D. Missouri, W. D.   April 2, 1920.)

No. 186.

1. **Patents ⬅328—Process patent for treating water not anticipated.**
   The Ornstein patent, No. 1,142,361, for a process for antisepticizing water, consisting of a method whereby chlorin is uniformly distributed through a minor body of water flowing as a continuous current into a larger body of water, also flowing as a continuous current, *held* valid and not anticipated.

2. **Patents ⬅65—Reference to process as inefficient not anticipation.**
   A process patent for purifying water, by treating with chlorin a minor body, was not anticipated by mere reference in an earlier patent to the method of indirect chlorination, without description, and coupled with the declaration that it was inefficient.

3. **Patents ⬅255—Right of replacement limited to legitimate repair.**
   The right of replacement, improvement, substitution, or resupplying of an element of a patented apparatus depends entirely on whether the purpose is legitimate repair in the sense of restoration of worn-out or broken parts.

4. **Patents ⬅259—Replacement of part of device used with patented process held contributory infringement.**
   Where the owners of a process patent for purifying water licensed its use by purchasers of the apparatus by which it was made operative, defendants, who sold a device to two of such purchasers, one of whom assisted in installing it in place of one of the parts of the patentee's apparatus, *held* guilty of contributory infringement, where the substitution was not made because the part was worn out, and where the parts supplied were not small and trifling in character.

5. **Patents ⬅259—Adaptability to other uses or dissimilarity with corresponding element not test of contributory infringement.**
   Where defendants were supplying a device for use in complainant's patented process for purifying water, it did not preclude contributory infringement that the device was adapted to other uses, or was not identical in size or form with the corresponding element in complainant's machine.

6. **Patents ⬅255—Patented process cannot be used in connection with radical transformation of patentee's machine.**
   Where a patentee of a process licensed its use in connection with machines sold by him, the continued right to use it could not accompany any radical transformation of his machine by repairs.

In Equity.   Suit by the Electro Bleaching Gas Company against William G. Miller, and another.   On final hearing.   Decree for complainant.

David M. Proctor and George Y. Thorpe, both of Kansas City, Mo., for complainant.

Arthur C. Brown, of Kansas City, Mo., for respondents.

VAN VALKENBURGH, District Judge.   On June 8, 1915, a process patent, No. 1,142,361, for antisepticizing water was issued to complainant as assignee of Georg Ornstein, the inventor.   The application for this patent was filed February 14, 1913.   The invention

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"comprises a method wherein chlorin in determined amounts is uniformly distributed through and absorbed by a minor body of water flowing as a continuous current and said minor body is then uniformly distributed through a major body of water, also flowing as a continuous current, all said operations being conducted without pause sufficient to allow disappearance of any substantial amount of said chlorin as free chlorin prior to exercising its antiseptic action."

The apparatus by which the patented process is made operative is shown in Figure 1, accompanying the application and patent, and comprises an absorption tower, through which the minor flow of water passes downward to absorb an upwardly moving current of chlorin gas. The chlorin is supplied from a tank of compressed and liquefied chlorin gas from which a pipe leads into the lower part of the tower. The tank is provided with a shut-off valve, and the supply pipe with a pressure-reducing valve and a regulating valve. Water is supplied to the tower from any suitable source, giving a constant, or substantially constant, head through a pipe which leads into the top of the tower, and is provided with a shut-off valve and a regulating valve. The water supply pipe is also provided with means for measuring the water flowing through it to the tower. For this purpose a suitable meter for indicating the quantity of water which has passed through the meter may be used. The chlorinated water from the tower is discharged through a pipe to be united with the body of flowing water to be treated. The minor flow of water, after being chlorinated in the tower, is discharged directly into the water to be treated. The absorption tower is formed of a vertically set shell of earthenware or other suitable material, resistant to chlorin, filled, or substantially filled, with broken stone, coke, or other suitable distributing material, adapted to film out the water and cause it to present an extended area of surface for contact with the ascending current of gas. The chlorin admitted to the minor flow of water is measured in determined proportion to the amount of water to be treated, but not necessarily with exactness in proportion to the minor flow. By this method a better and more effective solution is obtained, and better diffusion and distribution in the water to be treated, resulting in more complete and satisfactory sterilization of the water to be treated, less waste and loss of chlorin, and less injury to the metallic part of the structure through the destructive action of the chlorin than can be accomplished by direct methods of introduction of the chlorin into the main body of the water to be treated; also excessive chlorination, with its attendant disagreeable features, is avoided.

Complainant does not directly sell or license the right to use its process. Originally it manufactured the apparatus and sold it with the implied right to employ the process as an incident to the use; since then it has entered into a license agreement with the Wallace-Tiernan Company, which now manufactures and sells the apparatus. Complainant depends for its return for the use of its patented process upon royalties from the Wallace-Tiernan Company under the terms of this license agreement.

The two main features or elements of the invention are the minor continuous flow of water and the regulation of the current of chlorin gas introduced therein in an amount predetermined with reference to the volume of water to be treated. The first of these elements employs as its vehicle the absorption tower with its appurtenances; the second, the pressure-reducing and regulating valves, with their attendant mechanism, constituting what is commonly called a "regulator."

The respondents manufacture what they term the "Miller chlorin gas pressure regulator," which apparently is a mechanical equivalent performing the same office and producing the same result as the pressure reducing and regulating valves of complainant's apparatus. The complainant, or its licensee, sold to the city of Chicago, for use in its municipal water plants, a number of complete sets of apparatus, carrying with them the usual incidental right to employ complainant's process; later, the city purchased a Miller chlorin gas pressure regulator to replace the corresponding part in complainant's apparatus. The purchase was made from the Municipal Supply Company of Chicago, which, through one Bradway, had been constituted the agent of respondents for the sale of their device. The respondent Miller was present in person, instructing the city's operators how to place in service the chlorinator furnished by respondents to the Municipal Supply Company. The reason for making the change is thus stated by Mr. Henry W. Clausen, formerly assistant city engineer of the city of Chicago:

"In order to avoid excessively high maintenance costs and to obtain better regulation of gas flow than we were able to obtain with the Electro Bleaching Gas Company's apparatus.

"Q. How did the use of the chlorinator purchased from the Municipal Supply Company enable the city of Chicago to avoid excessively high maintenance costs and obtain better regulation of gas flow in comparison with the chlorinator furnished with the Electro Bleaching Gas Company's apparatus? A. Because the construction of the same was very much more rugged and adaptable to handling by the local labor in Chicago than the delicate apparatus furnished by the Electro Bleaching Gas Company. The reason for the better control was due to the fact that the apparatus of the Electro Bleaching Gas Company was out of adjustment and repair principally because of the rough handling above referred to.

"Q. The Electro Bleaching Gas Company's chlorinator was not inherently defective and incapable of performing the mechanical function for which it was intended, on account of its delicate mechanism? A. No.

"Q. Do you attribute a part of the difficulty experienced by the city of Chicago in its use of the chlorinator just named to the methods employed in its readjustment and repair? A. Yes.

"Q. Who had charge of the repair and the readjustment of the Electro Bleaching Gas Company's chlorinators during your connection with the city? A. The operation of these instruments was under the direction of the various chief operating engineers at the stations. The local labor unions decreed that the same should be maintained by the steam fitters. The steam fitters, in the majority of cases, knew nothing about the apparatus and usually spoiled the same, when applying a Stillson wrench to something which should be handled by one with delicate fingers as a watch maker. This finally resulted in the machines, when in need of repair, being taken out of service and sent to the city's municipal shops, where they were repaired by an expert machinist, who had been educated to the job. This, however, resulted in more or less contention among the labor unions, with the result that we always had difficulty in keeping the apparatus up to proper efficiency.

"Q. Could not a skilled mechanic or engineer have kept the Electro Bleaching Gas Company's chlorinator in a condition of reasonable efficiency with less delay and expense than that incident to their repair by the steam fitters? A. I think so."

Complainant, or its said licensee, also sold a set of apparatus to the city of Kansas City, Kan., for use in the municipal plant which supplies water to the two cities. At the solicitation of said city, respondents subsequently sold it a Miller chlorin gas pressure regulator. The reason for this purchase is stated by Mr. Lloyd Mangun, chemist in charge of water purification of Kansas City, Kan., to be because complainant's valve mechanism was insufficient in capacity to get the required quantity of gas into the coke-filled tower. It appears that the demand for water supply had increased since complainant's mechanism was installed. I append that portion of Mr. Mangun's testimony which bears upon this phase of the controversy:

"Q. You stated that the plaintiff's valve mechanism was insufficient in capacity. There was nothing, so far as you could observe, inherently defective about the mechanism? A. Not that is not true of any other machine.

"Q. Well, could you have gotten a larger quantity of gas into the coke-filled tower by using another valve mechanism of the plaintiff's? A. Undoubtedly we could have; yes, sir.

"Q. Do you know whether that is done or not in connection with water plants? A. I don't understand your question.

"Q. Is that ever done? Do they duplicate· or— A. (interrupting). Enlarge machines?

"Q. Yes. A. Yes, sir.

"Q. I don't mean enlarge; I mean add additional units? A. We could install other units or replace it with a larger unit, as we did.

"Q. Yes; that is all."

Recross-examination by Mr. Brown:

"Q. By a larger unit, you mean a larger control mechanism, valve having a larger opening through it? A. A mechanism with a larger orifice and gauge which would indicate more chlorin."

Complainant brings this suit against respondents for contributory infringement, charging the respondents with using and practicing, causing to be used and practiced, and contributing to the use and practice of, the process of antisepticizing water which constitutes the invention set forth in claims 1 to 12 of its letters patent, by the substitution of the vital element performed by the regulator. Since this suit was brought, the death of respondent Miller has been suggested, and the appearance of Minnie Miller, the administratrix of his estate, has been entered as a party defendant. No part of the apparatus in question, as such, is covered by patent.

Respondents interpose two defenses: (1) That the alleged improvements set forth in the said letters patent were not novel and patentable when produced by the inventor, and the patent is accordingly invalid. (2) Even though the patent be upheld, respondents are protected by the right of use, enjoyment, repair, and improvement in the purchasers of the apparatus. I shall consider these defenses in the order named.

[1] In support of their first contention respondents cite a number of previous patents and publications which they claim anticipate

the invention described in letters patent No. 1,142,361, and make disclosure in view of which the Ornstein process cannot be held to be of that dignity which the law requires to support the granting of letters patent. At the trial all except two of these citations were abandoned, and reliance was placed upon the Weis and Anderson patent, No. 694,-081, issued February 25, 1902, upon apparatus for saturating liquids with gases, and Darnall patent, No. 1,007,647, issued October 31, 1911, disclosing a process of purifying water and sewage. The former of these has as its primary object "to provide an apparatus for economically carrying out the process of producing an aqueous solution of chlorin," devised "more especially for use in the manufacture of paper for bleaching the stock." This patent has an object and purpose entirely unrelated to the purification of water, which may be said to occupy a field distinct and complete in itself. The process disclosed by Weis and Anderson is entirely remote from and unadapted to the purposes of the patent in suit. It discloses a method of producing an aqueous solution of chlorin and storing it in a reservoir from which it may be drawn off for use as needed. The apparatus embraces no pressure reducing or regulating device by which the proportion of chlorin to any other body is predetermined. Of course, the feature of distribution, through a minor body of liquid flowing as a continuous current into a major body, is conspicuously absent because in no wise related to the object of the inventor. The Weis and Anderson patent does not remotely suggest the process of the patent in suit.

The Darnall patent has the merit of dealing with the same subject-matter, to wit, the purification or sterilization of water by treating with chlorin gas. It, however, avowedly deals with the direct communication of the chlorin to the body of water to be purified as distinguished from the indirect method by means of a minor flow, which is the distinctive achievement and advance accomplished by the Ornstein process. Darnall's patent discloses a receptacle containing broken stone, coke, or suitable distributing material; but this is brought into immediate contact with the major body of water to be treated, is not the medium through which is conducted a minor flow of water, nor is any such minor flow used in connection with the Darnall process. The theory of absorption and distribution is entirely different, and in the prior patent there is nothing which suggests the method disclosed by Ornstein. In fact, the indirect method is especially disclaimed and discredited in the Darnall patent, which says:

"The chlorinated lime or soda, or the chlorin gas, has usually been mixed with a certain quantity of water and determined amounts of this chlorinated water have been introduced into the effluvia to be disinfected. This is not an efficient method of using chlorin, because in the process of fluid sterilization by chlorin the principal disinfecting agent is not the chlorin itself but the oxygen liberated from water by the action of chlorin on the water. * * * When, therefore, chlorinated lime, chlorinated soda, or chlorin gas is admixed with a quantity of water and this water is afterward used to disinfect or purify large quantities of other water a great loss of efficiency is the result."

[2] Respondents point to this language as a disclosure which anticipates the Ornstein patent; but this argument loses sight of the im-

264 F.—28

portant consideration that in the Darnall specification no process of indirect chlorination is disclosed. The mere reference to such a method, without description and coupled with the declaration that such a method is inefficient, cannot be said to anticipate even by suggestion. Darnall, in this very language, discloses that the vital principle of the Ornstein process remained unperceived. He says the chlorin gas had usually been mixed with a certain quantity of water and determined amounts of this chlorinated water had been introduced into the body to be disinfected. In the methods with which he had been familiar, if any, it would appear that chlorin gas was admixed with a quantity of water and this water was afterwards used to disinfect or purify. It had never occurred to those who were studying this problem, and who were endeavoring to get successful and satisfactory distribution and conservation of the disinfecting property of the chlorin, that a predetermined amount of chlorin, in exact proportion to the body to be purified, might be introduced into that body through the instrumentality of an active minor flow, to the volume of which the amount of chlorin used need bear no fixed ratio. The idea of chlorin in determined amounts being uniformly distributed through a major body of water by means of a minor body flowing as a continuous current and carrying the chlorin in solution had not yet been conceived. This was the pregnant contribution of Ornstein to this art. As Prof. Jackson said in substance: Ornstein discovered a principle that accomplished a result which all scientific students of the art had been vainly seeking for years, and which converted previous uniform failure into pronounced success. Since this invention, the Ornstein method is rapidly displacing other methods of water purification and has given abundant evidence of its utility.

It is further urged that in his specification Ornstein conceded that "the reducing valve is not necessary for the securing of results sufficiently accurate for all practical purposes." But this statement was made in describing the operation of the alternative form of apparatus shown in Figure 2, and applies there only "where the flow of chlorin is comparatively small or not long continued." Figure 2 describes, as has been stated, an alternative and radically different application of the process from that described in Figure 1, and now under consideration. This application, as disclosed by Figure 2, has since been discredited by experiment and abandoned. It forms no basis of the claims in suit. It should be added that the Darnall patent was in reference before the examiner in the Patent Office, and did not operate to defeat Ornstein's application.

It is my conclusion, therefore, that the patent in suit was not anticipated in any prior patent or publication, and that it is valid and of great value to the public. It falls directly within the principle announced in Loom Co. v. Higgins, 105 U. S. 591, 26 L. Ed. 1177; Kryptok Co. v. Stead Lens Co. (D. C.) 207 Fed. 85; Stead Lens Co. v. Kryptok, 214 Fed. 368, 131 C. C. A. 144; New York Scaffolding Co. v. Whitney, 224 Fed. 452, 140 C. C. A. 138.

We pass now to a consideration of the charge of contributory in-

fringement. The rule is thus stated in Walker on Patents (5th Ed.) par. 407, p. 492:

"Contributory infringement is intentional aid or co-operation in transactions, which collectively constitute complete infringement. For example: Where a person furnishes one part of a patented combination, intending that it shall be assembled with the other parts thereof, and that the complete combination shall be used or sold, that person is liable to an action, as infringer of the patent on the complete combination. The part furnished must, however, be an element of the combination. * * * Furthermore, where a person furnishes a machine, composition of matter or other article, which is particularly adapted to be used in performing a patented process, and which the person furnishing the same, intends shall be thus used, that person is liable as a contributory infringer, for any infringement which afterward occurs in accordance with his intention. But where the machine or other property thus furnished, is useful for some other purpose than to be a part of a patented combination, or to make a patented article, or to be operated upon by a patented machine, or to be used in performing a patented process, and where he who furnishes the property, does not intend or know, when furnishing the same, that it is to be thus used, he incurs no liability to an action for infringement. But if he knew or intended that the property furnished by him was to be used in either of the infringing ways, he cannot defeat an action for infringement, by showing that the furnished property could have been used in some noninfringing way."

The same author considers the right of repair in paragraph 302a, p. 362, of the same edition:

"A purchaser may repair a patented machine which he has purchased, by replacing broken or worn-out unpatented parts, so long as the identity of the machine is not destroyed, provided the machine itself is not an infringement. Likewise another who furnishes the repair parts on the order of the purchaser is not liable for infringement in the absence of a license reservation to the patentee to supply such parts. The right of him furnishing repair parts is measured by the right of the user to repair. And he may improve such a machine for his own peculiar use, by substituting for an unpatented part thereof, a corresponding part originally purchased, or not purchased, from the patentee. But no unauthorized person can lawfully engage in the business of reconstructing patented machines for their owners, by omissions and substitutions of parts, where those machines do not require any repair, but are thus changed with a view to their improvement."

A large number of cases carefully examined discloses many considerations that have been emphasized and featured by the courts in the practical application of the doctrine to the special facts of the cases with which they have had to deal. In some the fact of whether the element itself was patented or unpatented has been deemed important, whether it is the chief element or a more or less important element, whether it is more or less temporary in its nature, more or less exposed, fragile, and liable to wear or breakage, whether it is a vital element or an ordinary working part especially subject to external forces, easily removed and replaced without affecting the identity of the machine, and whether such removal and replacement is, in the nature of things, contemplated by both patentee and purchaser, whether it is an article in general use, extensively made and sold, whether its consumption is the very purpose of the device and whether it is a negligible or more substantive part of the whole.

Much of the confusion and resulting conflict which have found their way into the decisions of the courts are traceable, I think, to some

misconception as to the breadth of the definition to be assigned to the word "repair" and the incidental words "replacement" and "improvement," and to misinterpretation of the scope of the language of the Supreme Court in two earlier cases, Wilson v. Simpson et al., 9 How. 109, 13 L. Ed. 66, and Chaffee v. Boston Belting Co., 22 How. 217, 16 L. Ed. 240. In the former case it was said:

"Repairing partial injuries, whether they occur from accident or from wear and tear, is only refitting a machine for use. And it is no more than that, though it shall be a replacement of an essential part of a combination."

In Chaffee v. Boston Belting Company this language occurs:

"It is obvious, that if a person legally acquires a title to that which is the subject of letters patent, he may continue to use it until it is worn out, or he may repair it or improve upon it, as he pleases, in the same manner as if dealing with property of any other kind."

Seizing upon these terms the courts, in some instances, have given to the words "replacement" and "improvement" a very broad significance. That the distinction between legitimate repair and substantial reconstruction is sometimes a difficult one is nowhere better illustrated than in a leading case in this circuit. Shickle et al. v. St. Louis Car-Coupler Co., 77 Fed. 739, 23 C. C. A. 433. Judge Thayer, while sustaining the right to make and sell for purposes of repair only, to purchasers from the patentee, the knuckle of the automatic car coupler covered by valid patents, does so upon the ground that, "while this is one of the most important elements of the combination, it is yet peculiarly liable to be broken by shock or strain." The learned judge, however, with distinctive caution carefully guards the doctrine announced against unwarranted latitude in application. He says:

"The rule is well established that one who purchases a machine or mechanical contrivance consisting of several distinct parts, which, as a whole, is covered by a patent, has the right, by virtue of his purchase from the patentee, to repair a part of the machine or device which happens to be broken through accident, or which becomes so far worn as to render the machine inoperative, provided the machine, as a whole, still retains its identity, and what is done in the way of rendering it operative does not amount to reconstruction, and provided, further, that the part so replaced is not separately covered by a patent. * * * While the foregoing propositions are well settled, a difficulty is sometimes encountered in applying them. It is not always easy to determine whether the replacing of a part or element of a patented machine should be regarded as a reconstruction of the machine, or simply as a repair which does not destroy its identity. This remark is applicable in a measure to the case in hand. It may be conceded that the question to be decided is not altogether free from doubt. While no one would deny that a purchaser of one of the patent couplers now in question would have the right to replace the pivot pin or the locking pin, if one of these should happen to be broken, yet it may be admitted that it is not so obvious that he would have the right to replace a broken knuckle. * * * We would not be understood as deciding that the defendant company has the right to manufacture the knuckles which form a part of the complainant's device, and to sell them indiscriminately to all persons who see fit to buy them; for, clearly, such is not the law. * * * Therefore, if the defendant continues to manufacture the coupling heads or knuckles, and keeps them in stock, it must see to it that they are sold, for the purpose of repairing the patent coupling device, to persons or corporations who have acquired the right to make and use them for that purpose."

The wisdom and soundness of Judge Thayer's conservatism cannot better be confirmed than by a consideration of the later case of National M. Casting Co. v. American Steel Foundries (C. C.) 182 Fed. 626, in which car couplers were again the subject-matter of the litigation. The court said:

"The locks being specifically covered by valid claims, the supplying of such parts by the defendant, without the complainant's consent, whatever the purpose of their manufacture and sale or the use made of them by the purchaser, constitutes a direct infringement. But even if the locks were not protected by separate claims, and the patentee's rights therein were limited to them as elements of his combination device, as the defendant contends, the supplying of such locks by defendant could not, on the facts of this case, be justified on the ground of repairs. The parts supplied by the defendant are not strictly repairs. The defendant does not actually repair a defective part; it supplies new parts to railroad companies in advance of the actual need thereof. It is said that railroad economy requires that, at different points along the railways, supplies of the several parts of the different types of coupler in use be kept to replace, as occasion shall require, those that may become broken, defective, or lost.

"Car couplers are subjected to severe treatment, and, though made with a view of sustaining heavy shocks and strains, are bound to be injured in some of their parts. The brunt of the shock in coupling is undoubtedly borne by the knuckle, and, in the jolting and pulling which takes place in the continued movement of the cars, it is subjected to the greater strain. This is larger and heavier than the lock, which must be made small enough to enter and operate in the chamber or recess back of the knuckle head, and in which the knuckle tail operates. The lock is less likely to become defective than the knuckle, and save for the eye where the link is attached, is practically unbreakable. The chain or link attached to such locks, used for lifting them, is the lighter and more fragile, and is exposed to external injuries, and as a necessary result is the more easily injured. The injury to the links is the more frequent cause of the replacement of the lock, for the reason that it serves the interests of the railroads better, at the time a substitution is necessary, to substitute for the good lock with a defective link a new chain with an attached new lock. As a result, many new locks are put in operation while the old ones which they replace are in perfect serviceable condition. Such a replacement is not a repair of the lock. These locks with the defective links are subsequently sent to the repair shop, and such defective parts repaired or replaced.

"It is obvious that in the case of substituted locks and links, where the links only have been injured, no repairs are necessary to the locks, and that, when the defective links have been repaired or replaced, the company has an additional lock for each one purchased of the complainant; whereas, in case of repair or replacement authorized by the implied license, no greater number than that furnished by complainant would belong to the user."

The very late decision of the Supreme Court in Leeds & Catlin v. Victor Talking Machine Co., 213 U. S. 325, 29 Sup. Ct. 503, 53 L. Ed. 816, seems to bring order out of the confusion and conflict heretofore prevailing in some degree:

"There is a distinction between the article which a combination machine deals with and the constituent elements composing the combination; and while it may not be infringement to supply the unpatented article dealt with by the combination, it is infringement to make and supply an unpatented element, necessary for the operation of the combination. Morgan Envelope Co. v. Albany Paper Co., 152 U. S. 425 [14 Sup. Ct. 627, 38 L. Ed. 500], distinguished. * * * The right of substitution or resupply of elements of a combination extends only to a repair and replacement made necessary by deterioration so as to preserve its fitness; license goes no further and does not extend to furnishing such elements to increase effectiveness or variety of

the results of the combination. * * * It would seem that on principle when deterioration of an element has reached the point of unfitness there is a destruction of the combination and a renewal of the element is a reconstruction of the combination. And it would also seem on principle that there could be no license implied from difference in the durability of the elements or periodicity in their use."

[3] It thus appears that the right of replacement, improvement, substitution, or resupply of an element depends entirely upon the test of whether the purpose is legitimate repair in the sense of restoration of worn out or broken parts. The court says (213 U. S. loc. cit. 336, 29 Sup. Ct. 507, 53 L. Ed. 816):

"The license granted to a purchaser of a patented combination is to preserve its fitness for use so far as it may be affected by wear or breakage. Beyond this there is no license."

And where an entire element of a combination becomes unfit by deterioration it is broadly stated that there is then a destruction of the combination and that a renewal of that element by substitution amounts to reconstruction. The Supreme Court has further declared that:

"The courts in this country cannot declare that any one of the elements entering into such a combination is immaterial. They can only decide whether a part omitted by the alleged infringer is supplied by an equivalent device." Water Meter Co. v. Desper, 101 U. S. 332, 25 L. Ed. 1024; Weber Electric Co. v. Union Electric Co. (D. C.) 226 Fed. 482; Hinman et al. v. Visible Milker Co. (D. C.) 231 Fed. 174.

[4, 5] Respondents do not occupy the position of one who furnishes the property without knowledge that it is to be used in an infringing way. Their device was placed in the hands of the Municipal Supply Company of Chicago, whose name is, in itself, significant, and by that company sold to the city of Chicago for use at various water stations, and the respondent Miller was present and demonstrated its value for use in connection with complainant's process. Respondents further made a written bid and sold their chlorinator in response to a published proposal by the city of Kansas City, Kan. The original respondent Miller was also present and superintended the installation of the apparatus. It is evident that respondents have entered the field of water purification, supplying, and intending to supply, their device for use in complainant's patented process. In such case, it matters not that that device may be adapted to other uses, and that it is not identical in size or form with the corresponding element in complainant's machine. The case is the same as though the device was manufactured for general use and adapted to no other use than the infringement of complainant's patent.

Furthermore, in Chicago, defendant's device was used, not because complainant's structure was useless, or worn out, or unavailable, but because the city deemed the former more rugged and less liable to injury by incompetent workmen. This was not repair, but substitution and reconstruction. In the case of Kansas City, Kan., respondents' device was put in because greater capacity had become desirable. This could have been secured by additional units or a single larger unit

of complainant's manufacture. The original part is still retained by the city, and the two devices are used alternatively as occasion may demand. Here this element was furnished to increase effectiveness and variety of result, and not in any sense for repair. It was a substitution, and the circumstances are similar to the purchase of additional knuckles in advance for coupling devices, or additional records for talking machines.

The alleged repair parts supplied are not small and trifling in character. Complainant sold to the city of Chicago nine of these machines at an aggregate cost, including installation, of $13,875, making the cost of each approximately $1,540. Respondents sold their chlorinator to Kansas City, Kan., for $675, which is no inconsiderable part of the total cost of complainant's combination. Furthermore, this reducing and regulating element is in no sense temporary in its nature and subject to frequent replacement and restoration. It is probable that it is less durable than the tower, but it is in no sense the subject of frequent removal in the contemplation of inventor and purchaser. The photographs of respondents' device, exhibited to the court, show that it constitutes no inconsiderable proportion of the entire structure.

[6] It is to be remembered that this is a process patent; that the right to use the process was an incident merely of the right to use complainant's machine in its integrity and is coincident only with that use. The machine may be repaired for use as a machine, but the continued right to use the process patent cannot accompany any radical transformation of the machine. This consideration should limit, in some degree, the broad doctrine of those cases which go farthest in recognizing the right of a purchaser to treat a machine purchased as his own property for all purposes. In this case the cities and the respondents appear to have looked upon the matter as though the former had purchased an unrestricted right to use the process, and therefore should be allowed to remodel their machinery in any way which would enable them to operate it most effectively and satisfactorily. But the right to use the process depends exclusively upon the right to use the apparatus as sold. In such cases, the patentee must restrict such right more rigidly to the exclusive employment of its own mechanism, and the right of repair should not be extended to include substitution of important elements and practical reconstruction.

It follows from the foregoing that the finding and decree must be in favor of complainant.