## ELECTRO BLEACHING GAS CO. et al. v. PASCOAG WATER CO.
### No. 262.

District Court, D. Rhode Island.
Jan. 18, 1930.

Supplemental Opinion Oct. 9, 1930.

Wood, Molloy & France, of New York City, and Edwards & Angell, of Providence, R. I., for plaintiffs.

Arthur C. Brown, of Kansas City, Mo., William M. P. Bowen, of Providence, R. I., and E. C. Hamilton, of Independence, Mo., for defendant.

LETTS, District Judge.

This is a bill in equity brought to restrain the alleged infringement by the defendant of United States patent No. 1,142,361, which is upon a process of antisepticizing water, issued to one Georg Ornstein, assignor to the Electro Bleaching Gas Company. The suit involves claims 4, 5, 6, and 10 of said letters patent which were granted June 8, 1915.

The Electro Bleaching Gas Company is the owner of said patent and the Wallace & Tiernan Company, Inc., is the exclusive licensee. The plaintiffs contend that the apparatus in use by the defendant involves a process for antisepticizing water covered by the patent in this suit. The defendant alleges that the patent in question is invalid, and, if valid, is not infringed by the apparatus and process in use by it. The validity of letters patent No. 1,142,361 and various claims thereunder, including all of the claims involved in this action, have heretofore been considered by the federal courts in other districts and circuits. To now restate the various contentions in support of the alleged invalidity of the patent would entail needless repetition. See Electro Bleaching Gas Co. v. Miller et al. (D. C.) 264 F. 429; Miller et al. v. Electro Bleaching Gas Company (C. C. A.) 276 F. 379.

By its decision in the latter case, the Circuit Court of Appeals, Eighth Circuit, reverses the decision of the District Court on the ground of the absence of contributory infringement, but without passing on the validity of said patent.

In the case of Electro-Bleaching Gas Co. et al. v. Paradon Engineering Co. (D. C.) 8 F.(2d) 890, all claims of the Ornstein patent involved in the present suit were held valid. In the same case the Circuit Court of Appeals, Second Circuit, 12 F.(2d) 511, the decision of the District Court was affirmed and certiorari to the Supreme Court was denied. 273 U. S. 728, 47 S. Ct. 239, 71 L. Ed. 862.

In the case of Electro Bleaching Gas Co. et al. v. Greenport Sewerage Co. (D. C.) 33 F.(2d) 132, the same claims of the Ornstein patent were again involved and their validity upheld by Judge Campbell. With the result of these several analyses by Judge Campbell in the last two mentioned cases and the conclusions reached, I am in full accord.

The only additional matter here produced of consequence, not fully reviewed by the previous decisions, is the patent to one Woolf No. 580,919, issued April 20, 1897. This patent the defendant now contends constitutes a clear anticipation of the Ornstein patent.

It is necessary only to read the specifications and claims of the patent in suit in connection with the Woolf patent to appreciate how remote is the contention made. The Ornstein patent is for a process of antisepticizing water by means of providing a minor flow with an extended film-wise surface at one point in its path, at which point the flow

contacts a regulated predetermined amount of free chlorine gas which is taken into the solution before uniting with the main body of flowing water to be sterilized.

The patent recognizes the sterilizing properties of chlorine gas, but Ornstein makes no claim to that discovery. His claims are for a definite method or process of effectively applying and utilizing those properties. The Woolf patent describes and claims improvements in the methods and apparatus for disinfecting and deodorizing a flow of water or sewage. The apparatus which illustrates the method is totally unlike the Ornstein design. It consists of a device for passing a flow of sea water between plates or electrodes to be electrolyzed before its discharge into the brook or stream to be treated. There is not the remotest suggestion of how free chlorine gas could be practicably and scientifically used and applied as a sterilizing or purifying agent.

The only question in the case is that of infringement. The apparatus used by the Pascoag Water Company, the defendant, was purchased from the Electrolytic Chlorine Company, the manufacturer. It seems clear from the evidence presented and from the authorities already cited that the apparatus as originally purchased and operated constitutes an infringement of the Ornstein patent. The problem as to present infringement arises from the fact that subsequent to the purchase of the apparatus, but prior to the filing of the bill in this case, the defendant made certain modifications in the apparatus which it is claimed so altered the process as to obviate any basis of claimed infringement. The apparatus, as originally set up, consisted of a brine solution tank from which a salt solution was passed into an electrolytic cell, from which the chlorine gas was gathered by suction from an injector and passed into a minor flow of water where it was dissolved on the way to the point of contact or discharged into the major flow to be purified. This apparatus, at some points in the testimony referred to as a Williams' Cell, embodied every essential equivalent of the Ornstein patent.

Some time during the latter part of 1924 the defendant company altered the apparatus described by interposing an open earthern mixing tank in the line of the minor flow, so that the chlorinated minor flow, as illustrated on Defendant's Exhibit A, would discharge into this mixing tank and from there drain by gravity into the major flow. There was also interposed underneath the electric cell a drip pan, which collected the drip or overflow from that cell which represented the residue of the electrolyzed brine in the form of caustic soda. This drip, as illustrated by the Defendant's Exhibit A, is also discharged into the mixing tank before mentioned.

The case turns upon the question of what is the chemical resultant which now under defendant's process flows from the mixing tank into the major flow to be treated. Defendant contends that discharging the sodium hydroxid collected from the cell and mixing it with the solution of water and chlorine gas in the mixing tank results in a sodium hypochlorite. It was conceded at the time of the trial that if that assertion be true the disinfecting agent now used by the defendant is a different agent than that employed by the Ornstein patent which is a hypochlorous (possibly also hydrochloric) acid resulting from the taking of the free chlorine gas into the solution of the minor flow.

Upon this point the evidence is in sharp conflict. The testimony of Dr. Baker would indicate that the defendant company had not in fact run the caustic drip from the electric cell into the mixing tank but had permitted it to discharge through a hose line into a drain. Dr. Baker testified that the effect of conducting the drip from the cell into the mixing tank would not create the chemical resultant claimed by the defendant because of the extreme dilution of the chlorine mixture discharged into the mixing tank, so-called. He testified that with the addition of the caustic drip to the mixing tank the disinfecting agent which would flow into the main stream of water to be treated would still be hypochlorous acid.

I am inclined, from all the testimony, to believe that the addition of the earthern mixing tank by the defendant was not designed for the purpose of changing the disinfecting agent from that outlined in the Ornstein patent. There is basis in the testimony to believe that the real purpose for interposing the mixing tank was to provide a device to permit the escape of air drawn into the minor flow by the injector before the resulting solution or disinfecting agent should be discharged into the main flow of water treated. If these conclusions be true, the defendant corporation is infringing upon plaintiffs' patent and the relief prayed for should be granted.

To obviate, however, the possibility of error, the court will permit a reopening of

the case, if such request be presented by the defendant within sixty days from the date hereof, for presentation of additional evidence in respect to the chemical results of adding the caustic drip to the solution in the mixing tank. As a condition to such reopening of the case, however, the court must insist that any additional evidence be of such disinterested character as to be helpful, and recommends that the parties first agree with the court upon the character and method of obtaining the additional data or evidence to be submitted.

A decree in harmony with these conclusions may be presented for settlement and may properly recite the fact appearing of record that the Electrolytic Chlorine Company, the manufacturer of the apparatus used by the defendant, participated in and assumed the defense of this cause.

### Supplemental Opinion.

On January 18, 1930, the court filed its opinion in this cause, upholding the validity of patent No. 1,142,361, but, because of the extremely conflicting and, as the court then felt, unscientific character of the expert testimony presented, an injunction was not granted the plaintiffs to restrain the defendant from continuing the operation of its process of antisepticizing water then in use.

The defendant was afforded an opportunity, if requested within sixty days, to present additional evidence as to the chemical results of adding the caustic drip in the minor flow, described in the original opinion. Application by the defendant to reopen was made, and following a conference with counsel the court referred the scientific problem involved to Dr. Robert F. Chambers, head of the chemical department of Brown University. Dr. Chambers' disinterest in the parties and his professional qualifications are beyond question.

A stipulation was entered into between counsel, setting forth the scope and conditions of the reference. This stipulation, being a part of the record, I will here refer only to the seventh paragraph thereof, which is as follows: "Seventh: That the Court will request said expert to inspect the apparatus at defendant's plant and take such samples therefrom, for purposes of analyses, as he may deem desirable, provided that he be first satisfied that the conditions of operation at the time of taking such samples shall be in accordance with the testimony already presented. Said expert shall then file with this Court his report setting forth his opinion,

first, as to the purification agent used by the defendant under the conditions of operation already indicated and, second, his opinion as to the extent of the similarity or dissimilarity, identity or lack of identity of that agent as compared with the purifying agent resulting from the process outlined in plaintiffs' patent."

As the record now stands, this court is not at liberty to review or reverse its holding in the original opinion in respect to the validity of the so-called Ornstein patent. The process covered by said patent must, however, be considered in connection with the method or apparatus described therein for utilizing or carrying out the process. It appears beyond question that the element of time was considered of importance by Ornstein and entered into the definition and limitations of the process covered by his patent. For example, on page 1, lines 19 to 23 inclusive: "* * * all said operations being conducted without pause sufficient to allow disappearance of any substantial amount of said chlorin as free chlorin prior to exercising its antiseptic action: * * *"

Beginning with line 32, on page 1, the specifications state, referring to the use of chlorin as a disinfectant: "Its use however suffers from the drawback that it rapidly disappears, the free element going into combination and losing its bactericidal power. Light facilitates this disappearance, and further, most waters, and all sewages, contain substances reacting with chlorin in amounts sufficient to cause the disappearance of much more free chlorin than the minimal amount necessary for substantially complete sterilization. Organic matters, sulfur compounds, etc., all react chemically with free chlorin. *A certain amount of time is, however, necessary for this chemical disappearance,* while the bactericidal action is practically instantaneous."

On page 2, line 59, appears the following: "I find that by filming out the water and passing it against the gas as a countercurrent, I can produce an efficient absorption *at such a rate of speed as to give no substantial chemical disappearance of free chlorin by the time the solution is ready for introduction to the main body of water.*"

Again beginning with line 11, page 5, of the disclosures of the patent, Ornstein says: "In either manner of operating, the chlorinated water from the absorber is led into the body of liquid to be treated without any long continued delay and during the passage from the absorber to the body of

water to be treated the chlorinated water is protected from loss of its chlorin gas by being protected against access of circulating air and sunlight."

In other words, the process described and taught by Ornstein in his patent is clearly one for the rapid absorption of free chlorin by a minor flow of water and a rapid introduction and intermingling of that minor flow with the major flow.

It is apparent from Dr. Chambers' scientific study that there is grave doubt as to whether Ornstein under his process accomplished the results which he described in the disclosures of his patent, assuming the employment of an apparatus effecting, as nearly as possible, an instantaneous absorption of the free chlorin in the minor flow and the prompt introduction of that flow into the major flow. However that may be, the Ornstein patent discloses and claims no process which ignores the element of time, but teaches and discloses only a process wherein speed of operation and application is assigned as a necessary and important factor to accomplish the results intended. To otherwise read the teachings and claims of the patent would entail the abandonment of features which support the claim of invention and leave the patentee in the position of claiming invention in respect to the use of a minor flow as a means of mixing the chlorinated disinfectant with a major flow. Such a reading of the patent would raise grave doubt as to its validity.

It appears from Dr. Chambers' report that the interposition of the mixing tank and the extended length of pipe line, conducting the minor flow, disregards or eliminates the time factor stressed by Ornstein. The time consumed in conducting the minor flow into the major flow, after its discharge into the mixing tank where it is commingled with the caustic drip, is 4.4 minutes. This does not include the element of time between the point where the chlorin gas is introduced into the minor flow and its discharge into the mixing tank. It is clear that defendant's process, in respect to the important chemical reactions stressed by Ornstein, largely eliminates the time factor.

While Dr. Chambers' report indicates that the addition of the caustic drip does not substantially change the resulting disinfecting agent, it is most positive that the disinfecting agent employed in, or resulting from, defendant's process includes no or only negligible traces of dissolved molecular chlorin.

I find, therefore, that the defendant's process, as altered in September, 1924, and now in use, is not the equivalent of the one described by Ornstein, nor does it infringe the patent in question.

In accordance with the opinion previously filed herein, said patent as to claims 4, 5, 6, and 10 is found to be valid, and, further, that the defendant from February, 1924, until the date when it altered its process by interposing the mixing tank and discharging therein the caustic drip from the electrolytic cell, which date was approximately September 24, 1924, was infringing.

A draft decree, consistent with these findings, may be submitted for settlement.