**DANA CORPORATION, Plaintiff,**

v.

**AMERICAN PRECISION COMPANY (DIVISION OF AVNET, INC.), Century Clutch and Brake Supply, Inc., Century Parts, Inc., and Illinois Auto Truck Co., Inc., Defendants.**

**No. 82 C 6186.**

United States District Court, N.D. Illinois, E.D.

Sept. 18, 1985.

Robert L. Harmon & David A. Anderson, of William, Brinks, Olds, Hofer, Gilson & Lione Ltd., Chicago, Ill., Scott E. Flick, of Howrey & Simon, Washington, D.C., for plaintiff.

James D. Adducci, Michael Roche, Roger L. Longtin, L. Andrew Brehm of Schulyer, Roche & Zwirner, James B. Muska & Edward W. Osann, Jr. of Leydig, Voit, Osann, Mayer & Holt, Terrence W. McMillin, Marshall, O'Toole & Gerstein, Chicago, Ill., Barry L. Grossman, Harold Birch, of Banner & Birch, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge.

Plaintiff Dana Corporation ("Dana") brought this action against defendants Century Clutch and Brake Supply, Inc. and Century Parts, Inc. (collectively "Century"),[1] American Precision Company (division of Avnet) and American Precision Company, Inc. ("APC"),[2] and Illinois Auto Truck Co., Inc. ("IAT") for patent infringement and unfair competition.

**1.** Apparently Century Parts, Inc. no longer exists as a separate entity.

**2.** The assets of American Precision Company (division of Avnet) were sold to Everco Indus-

## PROCEDURAL BACKGROUND

The first count of the two-count amended complaint claims infringement of the following four patents allegedly held by Dana:

1. "Spring Loaded Clutch," United States Patent No. 3,394,788, issued July 30, 1968 ("788 Patent");

2. "Self-Adjusting Clutch," United States Patent No. 3,752,286, issued August 14, 1973 ("286 Patent");

3. "Clutch with Friction Reducing Lever Assembly," United States Patent No. 4,034,836 issued July 12, 1977 ("836 Patent"); and

4. "Coaxial Spring Damper Drive," United States Patent No. 4,254,855, issued March 10, 1981 ("855 Patent").

(Amended Complaint ¶ 4.) Dana alleges that within six years of the commencement of this action, APC infringed the 788, 286, and 836 patents. IAT and Century are alleged to have infringed all the patents named in paragraph 4 of the amended complaint within six years of the commencement of the action. (Amended Complaint, ¶¶ 5, 6.)

Although the nature of the defendants' allegedly infringing conduct is not specified in the amended complaint, it is now clear from the briefs of the parties that Century is accused of direct infringement by "reconstructing" Dana clutches and Coaxial Spring Driven Discs when it rebuilds them using one or more non-Dana "key" new parts. Dana has identified these "key" parts as follows:

| Patent | Description of Part |
| --- | --- |
| 788 | Pressure Springs |
| | Release Sleeve Retainer |
| | Flywheel Cover |
| | Spring Pivot |
| 286 | Adjusting Ring |
| | Release Sleeve Retainer |
| | Self-Adjusting Assembly |

tries, Inc. in 1984, and were merged into American Precision Company, Inc., a wholly-owned subsidiary of Everco.

| | | |
|---|---|---|
| 836 | · | Adjusting Ring K/e Levers |
| 855 | | C/A Assemblies Inner Cover Hubs |

IAT and APC are accused of contributory infringement by selling these "key" parts to Century and other rebuilders for use in the allegedly impermissible reconstruction of clutches. IAT is also charged with directly infringing the Coaxial Spring Driven Disc patent.

The second count's federal unfair competition claim is directed only against APC. It alleges that within three years of the commencement of this action, APC advertised, offered for sale, and sold in interstate commerce "disc assemblies as replacements for [Dana's] patented Spicer Coaxial Spring Driven Disc, and replacement parts therefor," (*Id.* at ¶ 13.) These assemblies and parts allegedly compete with Dana's "patented disc assembly" but differ in structure, function, and quality from Dana's product. (*Id.* at ¶¶ 13, 14.) However, APC represented to the purchasing public that its disc assemblies were equivalent to Dana's Spicer Coaxial Spring Driven Disc, according to Dana, with the intent that the public rely on such representations. The public was allegedly misled and confused by these violations. Dana concludes that APC's conduct violated federal trademark laws, specifically 15 U.S.C. § 1125(a).

The defendants responded to Dana's amended complaint with motions for summary judgment, all raising the equitable defenses of laches and estoppel. On April 24, 1984, Judge Getzendanner, who originally presided over this matter, issued a 33–page opinion denying defendants' motions based upon her understanding, gleaned from somewhat contradictory statements contained in Dana's briefs, of the nature of the allegedly infringing conduct challenged by Dana. As Judge Getzendanner explained in a subsequent October 31, 1984 order:

The court's original opinion concerning defendants' assertion of the equitable defenses of laches and estoppel was based on a misunderstanding of Dana's theory of infringement. In briefing the first motion for summary judgment, no party addressed the methods of clutch rebuilding and the differences between repair and return and production rebuilding. In defense of the previously filed motions for summary judgment, Dana argued that laches and estoppel could not be established because it had only recent knowledge of the infringing activities. Dana contended that even if evidence shows it knew of APC's and IAT's manufacture of component parts to its patented clutch assemblies and of Century Clutch's rebuilding, that knowledge alone would not put it on notice that use of the parts was direct infringement. Attempting to reconcile these two claims, the court interpreted Dana's claim of direct infringement as requiring a showing of rebuilding involving two or more key parts. When Dana finally explained that it sought to distinguish production rebuilding (infringing) and repair and return (noninfringing), the court granted Century Clutch leave to file a motion to reconsider.

The court considers Century Clutch's motion to reconsider the laches and estoppel rulings based on the new theory of infringement and the new evidence in their supporting memorandum a serious motion, at the very least with respect to the two earlier patents. Several documents tend to show that Dana had early knowledge of the production rebuilding industry and of Century Clutch's business as a production rebuilder. The seriousness of the motion has persuaded the court that a hasty ruling on the motion would be ill-advised. Moreover, Dana has intimated that production rebuilding even using only Dana-manufactured parts might constitute infringement. The court would have to consider this issue seriously and make a determination whether production rebuilding in general is infringement. This determination

would affect the decision regarding laches and estoppel, perhaps as to all four patents.

ITA and APC have also renewed their motion for summary judgment.

Summary judgment is a drastic remedy which should be granted only when it is clear that the requirements of Rule 56, Fed.R.Civ.P., have been met. *Poller v. Columbia Broadcasting*, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). All allegations and inferences are to be construed in the light most favorable to the non-moving party. *Id.* However, as the Seventh Circuit has admonished, "[w]ith the ever increasing burden upon the judiciary, persuasive reasons exist for the utilization of summary judgment procedure whenever appropriate." *Kirk v. Home Indemnity Co.*, 431 F.2d 554, 560 (7th Cir. 1970). Based upon the undisputed material facts, it is clear that defendants are entitled to judgment as a matter of law.

## BACKGROUND FACTS

Since its founding in 1946, Century has been in the business of rebuilding clutches. There are essentially two types of clutch rebuilders. "R & R" or custom rebuilders disassemble a worn clutch, locate defective parts and replace them with new or salvaged parts, clean the useable parts, and then reassemble the clutch using as many of its original parts as are still serviceable. A "production" rebuilder acquires a number of worn clutches, called cores, primarily as trade-ins for rebuilt clutches, disassembles the cores, cleans and sorts individual parts, salvaging those that can be reused and placing them in bins. Then, using a production line set-up, a number of clutches will be reassembled from as many salvaged parts as possible (although no care is taken to ensure that the parts from core "A" are all used to reassemble rebuilt core "A"). To the extent there are insufficient used parts, new replacements are included in the assembly.

Century is a production rebuilder. APC and IAT have supplied Century with new parts, including those identified by Dana as "key" parts, for use in the rebuilding process. Century does not have records sufficient to show how many new or key parts have been used in any particular rebuilt clutch, but it is undisputed that Century uses as few new parts as possible in its rebuilding process.

## DISCUSSION

■ It is important at the outset to determine exactly which conduct Dana alleges to constitute patent infringement. "R & R" rebuilding or "one-at-a-time repair of Angle Spring clutches, even with non-Dana parts, is not infringement." (Dana's Memorandum in Opposition to Summary Judgment, p. 5.) And rebuilding "without the use of any new parts (or using only unimportant new parts)" is also not challenged. (*Id.*) Rather, Dana poses the issue as follows:

> The question in this case is whether rebuilding worn out Angle Spring clutches employing new [one or more] *key parts* [of non-Dana origin]—parts that are intimately connected with the *essential gist* of the patented inventions—amounts to infringing reconstruction.

(*Id;* emphasis supplied.)

Based upon a review of the case law on reconstruction, this Court concludes the answer to the above question is a resounding "No".

The leading case on the repair/reconstruction distinction is *Aro Manufacturing Company v. Convertible Top Replacement Co.*, 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961) (*"Aro I"*). *Aro I* was a contributory infringement action seeking damages and an injunction based upon the manufacture and sale of fabric replacements for convertible roofs on automobiles. The convertible roof was subject to a combination patent. The Court first found that no patent was claimed as to the fabric or its shape; that "the fabric is no more than an unpatented element of the combination which was claimed as the invention." 81 S.Ct. at 601. Thus, "the principal and we think the determinative question presented here is whether the owner of a combination

patent, comprised entirely of unpatented elements, has a patent monopoly on the manufacture, sale or use of the several unpatented components of the patented combination." *Id.* But as the Court had held in *Mercoid Corp. v. MidContinent Co.*, 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376 (1944):

> The patent is for a combination only. Since none of the separate elements of the combination is claimed as the invention none of them when dealt with separately is protected by the patent monopoly.

64 S.Ct. 272. *See, also, Mercoid Corp. v. Minneapolis-Honeywell Regulator Co.*, 320 U.S. 680, 64 S.Ct. 278, 88 L.Ed. 396 (1944), in which the Court explained:

> The fact that an unpatented part of a combination patent may distinguish the invention does not draw to it the privileges of a patent. That may be done only in the manner provided by law. However worthy it may be, however essential to the patent, an unpatented part of a combination patent is no more entitled to monopolistic protection than any other unpatented device.

64 S.Ct. at 280.

Based on its holdings in the *Mercoid* cases, the *Aro I* Court concluded that the manufacture and sale of the replacement fabric was not itself a direct infringement under 35 U.S.C. § 271(a).

Aro was also charged with contributory infringement under 35 U.S.C. § 271(c) based upon the activities of Aro's customers. Since there can be no finding of contributory infringement under § 271(c) without a finding of direct infringement by customers of the alleged contributory infringer, the question thus became whether purchasers of the replacement fabric directly infringed the subject patent by "reconstructing" the article or merely engaged in "permissible repair." The Supreme Court found that the applicable test was stated in *Wilson v. Simpson*, 9 How. 109, 50 U.S. 109, 13 L.Ed. 66 (1850) as interpreted by *United States v. Aluminum Company of America*, 148 F.2d

416 (2d Cir.1945), which stated "the [patent] monopolist cannot prevent those to whom he sells from ... reconditioning articles worn by use unless they in fact make a new article." 148 F.2d at 425, quoted at 81 S.Ct. at 603.

The Court of Appeals had adopted an erroneous test in *Aro I* by focusing upon the relative importance of the fabric to the patented combination and the fact that although the life span of the fabric top was expectably shorter than the other components, the fabric top was not "an element that would expectedly wear out in a very short period of use." 270 F.2d 200, at 205, quoted 81 S.Ct. at 603. According to the Court of Appeals, only "minor" repairs were permissible and replacement of the fabric top was a "major reconstruction." *Id.* The patent holders in *Aro I* defended the erroneous Circuit Court test arguing:

> [T]hat when an element of a patented machine or combination is relatively durable—even though not so durable as the entire patented device which the owner purchased—relatively expensive, relatively difficult to replace, and is an "essential" or "distinguishing" part of the patent combination, any replacement of that element when it wears out or is otherwise spent, constitutes infringing "reconstruction" and, therefore, a new license must be obtained from, and another royalty paid to, the patentee for that privilege.

81 S.Ct. at 603.

The Court disagreed with this statement of the repair/reconstruction test:

> *[t]he basic fallacy in respondent's position is that it requires ascribing to one element of the patent combination the status of the patented invention in itself .... there is no legally recognizable or protected "essential" element "gist" or "heart" of the invention in a combination patent."*

81 S.Ct. at 604 (emphasis added).

Noting that the owner of a patented article has an implied license "to preserve its fitness for use so far as it may be affected by wear or breakage," the Court held

that the maintenance of the "use of the whole" of the patented combination through the replacement of a spent unpatented element does not constitute reconstruction.

[Reconstruction] is limited to such a true reconstruction of the entity as to in fact make a new article, after the entity viewed as a whole has become spent. In order to call the monopoly, conferred by the patent grant into operation for the second time it must indeed be a second creation of the patented entity ... [m]ere replacement of individual patented parts, one at a time, whether of the same part repeatedly or a different part successively, is no more than the legal right of the owner to repair his property.

81 S.Ct. at 604.

Relying upon *Aro I*, the Seventh Circuit in *National Standard Co. v. UOP, Inc.*, 616 F.2d 339 (7th Cir.1980), similarly rejected a claim that replacement of a key or "dominant" part in a patented device constituted reconstruction. There plaintiff, the exclusive licensee of a combination patent on a device used in the coal industry for sorting or classifying particles of coal by size, sued a manufacturer of a replacement screen for the patented device. The plaintiff claimed that the screen was the most material or dominant part of the device and that defendant's manufacture and sale of the replacement screen constituted contributory infringement because the replacements were used to reconstruct the device. Holding that such an argument was precluded under *Aro I*, the Seventh Circuit stated:

Plaintiff and its customers expected the sieves involved in this case to wear out after a relatively short period of use; the balance of the device was expected to remain operable for a much longer period. Plaintiff's total device sells for three times the price of a replacement sieve, and the sieve is only one of three elements in the patented combination. Although the device would be useless without the sieve, it would be equally useless without either of the two other elements of the patented combination.

*Id.* at 340. *See also Wells Mfg. Corp. v. Littelfuse, Inc.*, 547 F.2d 346 (7th Cir.1976) (replacement of entire switch, constituting the essential part, not reconstruction).

*Aro I* and its progeny thus clearly "eschewed the suggestion that the legal distinction between 'reconstruction' and 'repair' should be affected by whether the element of the combination that has been replaced is an 'essential' or 'distinguishing' part of the invention." *Dawson Chemical Co. v. Rohm and Haas Co.*, 448 U.S. 176, 217, 100 S.Ct. 2601, 2623, 65 L.Ed.2d 696 (1980). Dana's claim that the use of even *one* new "key" part of non-Dana origin in production rebuilding constitutes reconstruction (Dana Memorandum in Opposition to Motions for Summary Judgment, p. 4) is therefore clearly without merit.

The question remains, however, how much is too much? Dana has identified four key parts for the 788 patent, three key parts for the 286 and 855 patents, and two key parts for the 836 patent. If Century utilizes, for example, all four "key" parts for the 286 patent, can it be said that it has "recreated a new article" in violation of the patent laws?

The case law suggests not.

In *Wilbur-Ellis Co. v. Kuther*, 377 U.S. 422, 84 S.Ct. 1561, 12 L.Ed.2d 419 (1964), petitioner was a second-hand purchaser of machines (on which respondent held a patent) which were originally designed to pack fish into "1-pound" cans, 3 inches in diameter and $4^{11}/_{16}$ inches high. When the machines were purchased by Wilber-Ellis, they were corroded, rusted and inoperable. After cleaning, sandblasting the machines and resizing 6 of the 35 elements that made up the patented combination, the machines could operate to pack fish into "5-ounce" cans, $2^{1}/_{3}$ inches in diameter and $3^{1}/_{2}$ inches long. Both the trial court and the Ninth Circuit found impermissible reconstruction under *Aro I*, holding that the defendant's activities were "a true reconstruction of the entity as to in fact make a new article." 314 F.2d 71, at 73.

The Supreme Court reversed, summarily dismissing the claim that impermissible reconstruction was involved:

These four machines were not spent; they had years of usefulness remaining though they needed cleaning and repair. Had they been renovated and put to use on the 1–pound cans, there could have been no question but that they were "repaired", not "reconstructed".

377 U.S. at 424, 84 S.Ct. at 1563.

Since the sale of the machines was absolute with no limitation as to the size of the cans to be processed and since the size of the can to be used in the machine was not within the patent claims, the resizing of the machine was permissible repair. 377 U.S. at 424–25, 84 S.Ct. at 1563–64.

The Seventh Circuit in *TSC Industries, Inc. v. International Harvester Company,* 406 F.2d 53 (7th Cir.1968) has also indicated that substantial rebuilding of a non-spent patented item may be undertaken without engaging in reconstruction. In *TSC Industries,* plaintiff brought a declaratory judgment action seeking a declaration that its conduct did not constitute impermissible reconstruction. Defendant held a patent on a "doffer," the heart of a mechanized cotton picking machine. The "doffer" was a rotating element consisting of a metal carrier plate that had spaced rubber coated fingers that removed the cotton from the picking spindles. The Seventh Circuit's description of the defendants' rebuilding activities is similar, to a certain decree, with the challenged activity here:

> Plaintiff does not take the worn doffer to be repaired and thereafter return it to the original owner. Plaintiff purchases worn out '930 doffer assemblies for a nominal sum. After reclaiming the plate from the doffer assembly, plaintiff carries out additional steps which are identical with those performed by the defendant and which have been hereinbefore described. Plaintiff claims that what it has done is a "rerubbering" process and that it is a permissible repair and therefore, not an infringement.

> After accumulating a substantial number of defendant's worn and spent doffers, plaintiff follows the practice of initiating its "rerubbering" program. Plaintiff destroys what is left of the patented

doffer combination by removing the molded rubber lugs and the wafer-like web including the resilient lug sustaining portions of the web, spanning the space between the fingers of the carrier plate. It is possible to reuse the metal plate a number of times.

*Id.* at 55. The trial court found that plaintiff had destroyed the patented doffer and then reconstructed a new one. The Seventh Circuit reversed, holding that the challenged conduct constituted permissible repair.

■ This Court therefore concludes that even if Century replaced *all* of the so-called "key" parts with new non-Dana parts, no "second creation" of the patented combination would occur. Accordingly, Century does not engage in reconstruction simply by using new key parts in rebuilding, and APC and ITA are not contributory infringers for selling such parts to Century or other rebuilders.

But Dana has one more argument. Dana argues that because in the production rebuilding process it is unlikely "that any two parts in a Century rebuilt Angle Spring clutch originated from the same clutch," the rebuilt core loses its "identity" and is therefore "created" anew. (Dana Memorandum in Opposition, p. 11.)

■ This Court cannot agree. Dana's argument, in essence, is that Century's production line *method* of rebuilding can transform repair into reconstruction. Such a claim appears precluded by the Seventh Circuit's decision in *TSC Industries, supra.* The rebuilding process there, while not precisely a "production line," would seem similar enough to suggest a similar result here.

This conclusion is buttressed by the Court of Claims' decision in *General Electric Co. v. United States,* 572 F.2d 745, 215 Ct.Cl. 636 (1978). In *General Electric,* G.E. held patents on certain naval gun mounts which the navy repaired pursuant to its Ordinance Replacement Program. The Replacement Program's stated goal was to provide ships with "new or completely rebuilt" guns. 572 F.2d at 770. Under the Replacement Program, gun

mounts with a history of frequent repair were sent to Louisville, Kentucky, where they were disassembled to their "smallest readily separable part." 572 F.2d at 780. The parts from various mounts were treated as fungible and two out of five mounts were scrapped and cannibalized for parts. *Id.* Some parts, particularly wiring, were replaced without regard to wear. Finally, the result of the Replacement Program was to increase performance "beyond original specification" in many instances. *Id.* Relying in part on *Monroe Auto Equipment Co. v. Precision Rebuilders, Inc.*, 229 F.Supp. 347 (D.Kan.1964) (a case relied upon here by plaintiff), the trial court found that the Navy had engaged in impermissible reconstruction. The Appellate Court reversed:

> In these circumstances it seems to us that the user of the combination (the Navy) was not creating a "new article" in the sense of *Aro I*, even though the gun mounts were disassembled in order to be overhauled, and even though, in some or most or all instances, the reassembled elements were not returned to the same gun mount or the same ship ... The assembly-line method adopted at Louisville was simply a speedier, less expensive, more efficient, and more effective means of refurbishing the gun mounts than if they had been disassembled and renovated gun mount by individual gun mount, and then returned to the same ship—and the end-result as precisely the same. Disassembly and renovation by individual gun mount would surely not be enough to show reconstruction—or *Wilbur-Ellis* could not have been decided as it was—but it would have been a much more burdensome, time-consuming, and costly procedure. Achieving precisely the same result by a more practical, economical and convenient process is surely not required by patent law in order to avoid imposition of further liability. The substance of what was done to the mounts would be the same by either method, the difference being simply that the procedure followed by the Navy at Louisville was easier, quicker and less expensive.

*Id.* at 784, 786. While it is true that the Navy utilized primarily GE parts for its reconditioning, the Court of Claims strongly suggested that the source of "one or two" elements would not alter its analysis. 572 F.2d at 785 n. 21. Assuming *arguendo* that replacement of all the "key" parts were accomplished with non-Dana parts, production line rebuilding would still not constitute reconstruction because as stated in *General Electric:*

> Achieving precisely the same result by a more practical, economical and convenient process is surely not required by patent law in order to avoid imposition of further liability.

### CONCLUSION

The Court accordingly concludes that, as a matter of law, Century's production line rebuilding process utilizing one or more "key" parts of non-Dana origin does not constitute impermissible reconstruction. Century is therefore entitled to summary judgment on this claim. There being no direct infringement, there can be contributory infringement, and APC and IAT are therefore also entitled to summary judgment on this claim.